# PRICE WATERHOUSE *v.* HOPKINS

No. 87–1167.  Argued October 31, 1988—Decided May 1, 1989

230

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined. WHITE, J., *post*, p. 258, and O'CONNOR, J., *post*, p. 261, filed opinions concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 279.

*Kathryn A. Oberly* argued the cause for petitioner. With her on the briefs were *Paul M. Bator, Douglas A. Poe, Eldon Olson,* and *Ulric R. Sullivan.*

*James H. Heller* argued the cause for respondent. With him on the brief was *Douglas B. Huron.**

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join.

Ann Hopkins was a senior manager in an office of Price Waterhouse when she was proposed for partnership in 1982. She was neither offered nor denied admission to the partnership; instead, her candidacy was held for reconsideration the following year. When the partners in her office later re-

---

*Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* for the American Psychological Association by *Donald N. Bersoff;* for the Committees on Civil Rights, Labor and Employment Law, and Sex and Law of the Association of the Bar of the City of New York by *Jonathan Lang, Eugene S. Friedman, Arthur Leonard,* and *Colleen McMahon;* and for the NOW Legal Defense and Education Fund et al. by *Sarah E. Burns, Lynn Hecht Schafran, Joan E. Bertin, John A. Powell,* and *Donna R. Lenhoff.*

*Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Clegg, Brian J. Martin,* and *David K. Flynn* filed a brief for the United States as *amicus curiae.*

fused to repropose her for partnership, she sued Price Waterhouse under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, charging that the firm had discriminated against her on the basis of sex in its decisions regarding partnership. Judge Gesell in the Federal District Court for the District of Columbia ruled in her favor on the question of liability, 618 F. Supp. 1109 (1985), and the Court of Appeals for the District of Columbia Circuit affirmed. 263 U. S. App. D. C. 321, 825 F. 2d 458 (1987). We granted certiorari to resolve a conflict among the Courts of Appeals concerning the respective burdens of proof of a defendant and plaintiff in a suit under Title VII when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives. 485 U. S. 933 (1988).

## I

At Price Waterhouse, a nationwide professional accounting partnership, a senior manager becomes a candidate for partnership when the partners in her local office submit her name as a candidate. All of the other partners in the firm are then invited to submit written comments on each candidate — either on a "long" or a "short" form, depending on the partner's degree of exposure to the candidate. Not every partner in the firm submits comments on every candidate. After reviewing the comments and interviewing the partners who submitted them, the firm's Admissions Committee makes a recommendation to the Policy Board. This recommendation will be either that the firm accept the candidate for partnership, put her application on "hold," or deny her the promotion outright. The Policy Board then decides whether to submit the candidate's name to the entire partnership for a vote, to "hold" her candidacy, or to reject her. The recommendation of the Admissions Committee, and the decision of the Policy Board, are not controlled by fixed guidelines: a certain number of positive comments from partners will not guarantee a candidate's admission to the partnership, nor will a specific

quantity of negative comments necessarily defeat her application. Price Waterhouse places no limit on the number of persons whom it will admit to the partnership in any given year.

Ann Hopkins had worked at Price Waterhouse's Office of Government Services in Washington, D. C., for five years when the partners in that office proposed her as a candidate for partnership. Of the 662 partners at the firm at that time, 7 were women. Of the 88 persons proposed for partnership that year, only 1—Hopkins—was a woman. Forty-seven of these candidates were admitted to the partnership, 21 were rejected, and 20—including Hopkins—were "held" for reconsideration the following year.[1] Thirteen of the 32 partners who had submitted comments on Hopkins supported her bid for partnership. Three partners recommended that her candidacy be placed on hold, eight stated that they did not have an informed opinion about her, and eight recommended that she be denied partnership.

In a jointly prepared statement supporting her candidacy, the partners in Hopkins' office showcased her successful 2-year effort to secure a $25 million contract with the Department of State, labeling it "an outstanding performance" and one that Hopkins carried out "virtually at the partner level." Plaintiff's Exh. 15. Despite Price Waterhouse's attempt at trial to minimize her contribution to this project, Judge Ge-

---

[1] Before the time for reconsideration came, two of the partners in Hopkins' office withdrew their support for her, and the office informed her that she would not be reconsidered for partnership. Hopkins then resigned. Price Waterhouse does not challenge the Court of Appeals' conclusion that the refusal to repropose her for partnership amounted to a constructive discharge. That court remanded the case to the District Court for further proceedings to determine appropriate relief, and those proceedings have been stayed pending our decision. Brief for Petitioner 15, n. 3. We are concerned today only with Price Waterhouse's decision to place Hopkins' candidacy on hold. Decisions pertaining to advancement to partnership are, of course, subject to challenge under Title VII. *Hishon* v. *King & Spalding*, 467 U. S. 69 (1984).

sell specifically found that Hopkins had "played a key role in Price Waterhouse's successful effort to win a multi-million dollar contract with the Department of State." 618 F. Supp., at 1112. Indeed, he went on, "[n]one of the other partnership candidates at Price Waterhouse that year had a comparable record in terms of successfully securing major contracts for the partnership." *Ibid.*

The partners in Hopkins' office praised her character as well as her accomplishments, describing her in their joint statement as "an outstanding professional" who had a "deft touch," a "strong character, independence and integrity." Plaintiff's Exh. 15. Clients appear to have agreed with these assessments. At trial, one official from the State Department described her as "extremely competent, intelligent," "strong and forthright, very productive, energetic and creative." Tr. 150. Another high-ranking official praised Hopkins' decisiveness, broadmindedness, and "intellectual clarity"; she was, in his words, "a stimulating conversationalist." *Id.*, at 156–157. Evaluations such as these led Judge Gesell to conclude that Hopkins "had no difficulty dealing with clients and her clients appear to have been very pleased with her work" and that she "was generally viewed as a highly competent project leader who worked long hours, pushed vigorously to meet deadlines and demanded much from the multidisciplinary staffs with which she worked." 618 F. Supp., at 1112–1113.

On too many occasions, however, Hopkins' aggressiveness apparently spilled over into abrasiveness. Staff members seem to have borne the brunt of Hopkins' brusqueness. Long before her bid for partnership, partners evaluating her work had counseled her to improve her relations with staff members. Although later evaluations indicate an improvement, Hopkins' perceived shortcomings in this important area eventually doomed her bid for partnership. Virtually all of the partners' negative remarks about Hopkins—even those of partners supporting her—had to do with her "inter-

personal skills." Both "[s]upporters and opponents of her candidacy," stressed Judge Gesell, "indicated that she was sometimes overly aggressive, unduly harsh, difficult to work with and impatient with staff." *Id.*, at 1113.

There were clear signs, though, that some of the partners reacted negatively to Hopkins' personality because she was a woman. One partner described her as "macho" (Defendant's Exh. 30); another suggested that she "overcompensated for being a woman" (Defendant's Exh. 31); a third advised her to take "a course at charm school" (Defendant's Exh. 27). Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only "because it's a lady using foul language." Tr. 321. Another supporter explained that Hopkins "ha[d] matured from a tough-talking somewhat masculine hard-nosed mgr to an authoritative, formidable, but much more appealing lady ptr candidate." Defendant's Exh. 27. But it was the man who, as Judge Gesell found, bore responsibility for explaining to Hopkins the reasons for the Policy Board's decision to place her candidacy on hold who delivered the *coup de grace:* in order to improve her chances for partnership, Thomas Beyer advised, Hopkins should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 618 F. Supp., at 1117.

Dr. Susan Fiske, a social psychologist and Associate Professor of Psychology at Carnegie-Mellon University, testified at trial that the partnership selection process at Price Waterhouse was likely influenced by sex stereotyping. Her testimony focused not only on the overtly sex-based comments of partners but also on gender-neutral remarks, made by partners who knew Hopkins only slightly, that were intensely critical of her. One partner, for example, baldly stated that Hopkins was "universally disliked" by staff (Defendant's Exh. 27), and another described her as "consistently annoying and irritating" *(ibid.);* yet these were people who had had very little contact with Hopkins. According to

Fiske, Hopkins' uniqueness (as the only woman in the pool of candidates) and the subjectivity of the evaluations made it likely that sharply critical remarks such as these were the product of sex stereotyping—although Fiske admitted that she could not say with certainty whether any particular comment was the result of stereotyping. Fiske based her opinion on a review of the submitted comments, explaining that it was commonly accepted practice for social psychologists to reach this kind of conclusion without having met any of the people involved in the decisionmaking process.

In previous years, other female candidates for partnership also had been evaluated in sex-based terms. As a general matter, Judge Gesell concluded, "[c]andidates were viewed favorably if partners believed they maintained their femin-[in]ity while becoming effective professional managers"; in this environment, "[t]o be identified as a 'women's lib[b]er' was regarded as [a] negative comment." 618 F. Supp., at 1117. In fact, the judge found that in previous years "[o]ne partner repeatedly commented that he could not consider any woman seriously as a partnership candidate and believed that women were not even capable of functioning as senior managers—yet the firm took no action to discourage his comments and recorded his vote in the overall summary of the evaluations." *Ibid.*

Judge Gesell found that Price Waterhouse legitimately emphasized interpersonal skills in its partnership decisions, and also found that the firm had not fabricated its complaints about Hopkins' interpersonal skills as a pretext for discrimination. Moreover, he concluded, the firm did not give decisive emphasis to such traits only because Hopkins was a woman; although there were male candidates who lacked these skills but who were admitted to partnership, the judge found that these candidates possessed other, positive traits that Hopkins lacked.

The judge went on to decide, however, that some of the partners' remarks about Hopkins stemmed from an imper-

missibly cabined view of the proper behavior of women, and that Price Waterhouse had done nothing to disavow reliance on such comments. He held that Price Waterhouse had unlawfully discriminated against Hopkins on the basis of sex by consciously giving credence and effect to partners' comments that resulted from sex stereotyping. Noting that Price Waterhouse could avoid equitable relief by proving by clear and convincing evidence that it would have placed Hopkins' candidacy on hold even absent this discrimination, the judge decided that the firm had not carried this heavy burden.

The Court of Appeals affirmed the District Court's ultimate conclusion, but departed from its analysis in one particular: it held that even if a plaintiff proves that discrimination played a role in an employment decision, the defendant will not be found liable if it proves, by clear and convincing evidence, that it would have made the same decision in the absence of discrimination. 263 U. S. App. D. C., at 333–334, 825 F. 2d, at 470–471. Under this approach, an employer is not deemed to have violated Title VII if it proves that it would have made the same decision in the absence of an impermissible motive, whereas under the District Court's approach, the employer's proof in that respect only avoids equitable relief. We decide today that the Court of Appeals had the better approach, but that both courts erred in requiring the employer to make its proof by clear and convincing evidence.

## II

The specification of the standard of causation under Title VII is a decision about the kind of conduct that violates that statute. According to Price Waterhouse, an employer violates Title VII only if it gives decisive consideration to an employee's gender, race, national origin, or religion in making a decision that affects that employee. On Price Waterhouse's theory, even if a plaintiff shows that her gender played a part in an employment decision, it is still her burden to show that the decision would have been different if the employer had

not discriminated. In Hopkins' view, on the other hand, an employer violates the statute whenever it allows one of these attributes to play any part in an employment decision. Once a plaintiff shows that this occurred, according to Hopkins, the employer's proof that it would have made the same decision in the absence of discrimination can serve to limit equitable relief but not to avoid a finding of liability.[2] We conclude that, as often happens, the truth lies somewhere in between.

---

[2]This question has, to say the least, left the Circuits in disarray. The Third, Fourth, Fifth, and Seventh Circuits require a plaintiff challenging an adverse employment decision to show that, but for her gender (or race or religion or national origin), the decision would have been in her favor. See, e. g., Bellissimo v. Westinghouse Electric Corp., 764 F. 2d 175, 179 (CA3 1985), cert. denied, 475 U. S. 1035 (1986); Ross v. Communications Satellite Corp., 759 F. 2d 355, 365–366 (CA4 1985); Peters v. Shreveport, 818 F. 2d 1148, 1161 (CA5 1987); McQuillen v. Wisconsin Education Assn. Council, 830 F. 2d 659, 664–665 (CA7 1987). The First, Second, Sixth, and Eleventh Circuits, on the other hand, hold that once the plaintiff has shown that a discriminatory motive was a "substantial" or "motivating" factor in an employment decision, the employer may avoid a finding of liability only by proving that it would have made the same decision even in the absence of discrimination. These courts have either specified that the employer must prove its case by a preponderance of the evidence or have not mentioned the proper standard of proof. See, e. g., Fields v. Clark University, 817 F. 2d 931, 936–937 (CA1 1987) ("motivating factor"); Berl v. Westchester County, 849 F. 2d 712, 714–715 (CA2 1988) ("substantial part"); Terbovitz v. Fiscal Court of Adair County, Ky., 825 F. 2d 111, 115 (CA6 1987) ("motivating factor"); Bell v. Birmingham Linen Service, 715 F. 2d 1552, 1557 (CA11 1983). The Court of Appeals for the District of Columbia Circuit, as shown in this case, follows the same rule except that it requires that the employer's proof be clear and convincing rather than merely preponderant. 263 U. S. App. D. C. 321, 333–334, 825 F. 2d 458, 470–471 (1987); see also Toney v. Block, 227 U. S. App. D. C. 273, 275, 705 F. 2d 1364, 1366 (1983) (Scalia, J.) (it would be "destructive of the purposes of [Title VII] to require the plaintiff to establish . . . the difficult hypothetical proposition that, had there been no discrimination, the employment decision would have been made in his favor"). The Court of Appeals for the Ninth Circuit also requires clear and convincing proof, but it goes further by holding that a Title VII violation is made out as soon as the plaintiff shows that an impermissible motivation played a part in an employment

## A

In passing Title VII, Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of employees.[3] Yet, the statute does not purport to limit the other qualities and characteristics that employers *may* take into account in making employment decisions. The converse, therefore, of "for cause" legislation,[4] Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice. This balance between employee rights and employer prerogatives turns out to be decisive in the case before us.

Congress' intent to forbid employers to take gender into account in making employment decisions appears on the face of the statute. In now-familiar language, the statute forbids

---

decision—at which point the employer may avoid reinstatement and an award of backpay by proving that it would have made the same decision in the absence of the unlawful motive. See, *e. g. Fadhl* v. *City and County of San Francisco,* 741 F. 2d 1163, 1165–1166 (1984) (Kennedy, J.) ("significant factor"). Last, the Court of Appeals for the Eighth Circuit draws the same distinction as the Ninth between the liability and remedial phases of Title VII litigation, but requires only a preponderance of the evidence from the employer. See, *e. g., Bibbs* v. *Block,* 778 F. 2d 1318, 1320–1324 (1985) (en banc) ("discernible factor").

[3] We disregard, for purposes of this discussion, the special context of affirmative action.

[4] Congress specifically declined to require that an employment decision have been "for cause" in order to escape an affirmative penalty (such as reinstatement or backpay) from a court. As introduced in the House, the bill that became Title VII forbade such affirmative relief if an "individual was . . . refused employment or advancement, or was suspended or discharged *for cause.*" H. R. Rep. No. 7152, 88th Cong., 1st Sess., 77 (1963) (emphasis added). The phrase "for cause" eventually was deleted in favor of the phrase "for any reason other than" one of the enumerated characteristics. See 110 Cong. Rec. 2567–2571 (1964). Representative Celler explained that this substitution "specif[ied] cause"; in his view, a court "cannot find any violation of the act which is based on facts other . . . than discrimination on the grounds of race, color, religion, or national origin." *Id.,* at 2567.

an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate with respect to his compensation, terms, conditions, or privileges of employment," or to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's . . . sex." 42 U. S. C. §§ 2000e–2(a)(1), (2) (emphasis added).[5] We take these words to mean that gender must be irrelevant to employment decisions. To construe the words "because of" as colloquial shorthand for "but-for causation," as does Price Waterhouse, is to misunderstand them.[6]

But-for causation is a hypothetical construct. In determining whether a particular factor was a but-for cause of a given event, we begin by assuming that that factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way. The present, active tense of the operative verbs of § 703(a)(1) ("to fail or refuse"), in contrast, turns our attention to the actual moment of the

---

[5] In this Court, Hopkins for the first time argues that Price Waterhouse violated § 703(a)(2) when it subjected her to a biased decisionmaking process that "tended to deprive" a woman of partnership on the basis of her sex. Since Hopkins did not make this argument below, we do not address it.

[6] We made passing reference to a similar question in *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 282, n. 10 (1976), where we stated that when a Title VII plaintiff seeks to show that an employer's explanation for a challenged employment decision is pretextual, "no more is required to be shown than that race was a 'but for' cause." This passage, however, does not suggest that the plaintiff *must* show but-for cause; it indicates only that if she does so, she prevails. More important, *McDonald* dealt with the question whether the employer's stated reason for its decision was *the* reason for its action; unlike the case before us today, therefore, *McDonald* did not involve mixed motives. This difference is decisive in distinguishing this case from those involving "pretext." See *infra*, at 247, n. 12.

event in question, the adverse employment decision. The critical inquiry, the one commanded by the words of § 703(a)(1), is whether gender was a factor in the employment decision *at the moment it was made.* Moreover, since we know that the words "because of" do not mean "*solely* because of,"[7] we also know that Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore; an employer considers both gender and legitimate factors at the time of making a decision, that decision was "because of" sex and the other, legitimate considerations — even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account.

To attribute this meaning to the words "because of" does not, as the dissent asserts, *post,* at 282, divest them of causal significance. A simple example illustrates the point. Suppose two physical forces act upon and move an object, and suppose that either force acting alone would have moved the object. As the dissent would have it, *neither* physical force was a "cause" of the motion unless we can show that but for one or both of them, the object would not have moved; apparently both forces were simply "in the air" unless we can identify at least one of them as a but-for cause of the object's movement. *Ibid.* Events that are causally overdetermined, in other words, may not have any "cause" at all. This cannot be so.

We need not leave our common sense at the doorstep when we interpret a statute. It is difficult for us to imagine that, in the simple words "because of," Congress meant to obligate a plaintiff to identify the precise causal role played by legitimate and illegitimate motivations in the employment decision she challenges. We conclude, instead, that Congress meant

---

[7] Congress specifically rejected an amendment that would have placed the word "solely" in front of the words "because of." 110 Cong. Rec. 2728, 13837 (1964).

to obligate her to prove that the employer relied upon sex-based considerations in coming to its decision.

Our interpretation of the words "because of" also is supported by the fact that Title VII does identify one circumstance in which an employer may take gender into account in making an employment decision, namely, when gender is a "bona fide occupational qualification [(BFOQ)] reasonably necessary to the normal operation of th[e] particular business or enterprise." 42 U. S. C. § 2000e–2(e). The only plausible inference to draw from this provision is that, in all other circumstances, a person's gender may not be considered in making decisions that affect her. Indeed, Title VII even forbids employers to make gender an indirect stumbling block to employment opportunities. An employer may not, we have held, condition employment opportunities on the satisfaction of facially neutral tests or qualifications that have a disproportionate, adverse impact on members of protected groups when those tests or qualifications are not required for performance of the job. See *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977 (1988); *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971).

To say that an employer may not take gender into account is not, however, the end of the matter, for that describes only one aspect of Title VII. The other important aspect of the statute is its preservation of an employer's remaining freedom of choice. We conclude that the preservation of this freedom means that an employer shall not be liable if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person. The statute's maintenance of employer prerogatives is evident from the statute itself and from its history, both in Congress and in this Court.

To begin with, the existence of the BFOQ exception shows Congress' unwillingness to require employers to change the very nature of their operations in response to the statute. And our emphasis on "business necessity" in disparate-

impact cases, see *Watson* and *Griggs*, and on "legitimate, nondiscriminatory reason[s]" in disparate-treatment cases, see *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802 (1973); *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981), results from our awareness of Title VII's balance between employee rights and employer prerogatives. In *McDonnell Douglas*, we described as follows Title VII's goal to eradicate discrimination while preserving workplace efficiency: "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." 411 U. S., at 801.

When an employer ignored the attributes enumerated in the statute, Congress hoped, it naturally would focus on the qualifications of the applicant or employee. The intent to drive employers to focus on qualifications rather than on race, religion, sex, or national origin is the theme of a good deal of the statute's legislative history. An interpretive memorandum entered into the Congressional Record by Senators Case and Clark, comanagers of the bill in the Senate, is representative of this general theme.* According to their memorandum, Title VII "'expressly protects the employer's right to insist that any prospective applicant, Negro or white, must meet the applicable job qualifications. Indeed, the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.'"[9] 110 Cong. Rec. 7247 (1964), quoted in *Griggs* v.

---

* We have in the past acknowledged the authoritativeness of this interpretive memorandum, written by the two bipartisan "captains" of Title VII. See, *e. g.*, *Firefighters* v. *Stotts*, 467 U. S. 561, 581, n. 14 (1984).

[9] Many of the legislators' statements, such as the memorandum quoted in text, focused specifically on race rather than on gender or religion or national origin. We do not, however, limit their statements to the context of

*Duke Power Co., supra*, at 434. The memorandum went on: "To discriminate is to make a distinction, to make a difference in treatment or favor, and those distinctions or differences in treatment or favor which are prohibited by section 704 are those which are based on any five of the forbidden criteria: race, color, religion, sex, and national origin. Any other criterion or qualification for employment is not affected by this title." 110 Cong. Rec. 7213 (1964).

Many other legislators made statements to a similar effect; we see no need to set out each remark in full here. The central point is this: while an employer may not take gender into account in making an employment decision (except in those very narrow circumstances in which gender is a BFOQ), it is free to decide against a woman for other reasons. We think these principles require that, once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability[10] only by proving that it would have made the same

_____

race, but instead we take them as general statements on the meaning of Title VII. The somewhat bizarre path by which "sex" came to be included as a forbidden criterion for employment—it was included in an attempt to *defeat* the bill, see C. & B. Whalen, The Longest Debate: A Legislative History of the 1964 Civil Rights Act 115–117 (1985)—does not persuade us that the legislators' statements pertaining to race are irrelevant to cases alleging gender discrimination. The amendment that added "sex" as one of the forbidden criteria for employment was passed, of course, and the statute on its face treats each of the enumerated categories exactly the same.

By the same token, our specific references to gender throughout this opinion, and the principles we announce, apply with equal force to discrimination based on race, religion, or national origin.

[10] Hopkins argues that once she made this showing, she was entitled to a finding that Price Waterhouse had discriminated against her on the basis of sex; as a consequence, she says, the partnership's proof could only limit the relief she received. She relies on Title VII's § 706(g), which permits a court to award affirmative relief when it finds that an employer "has intentionally engaged in or is intentionally engaging in an unlawful employment practice," and yet forbids a court to order reinstatement of, or backpay to, "an individual . . . if such individual was refused . . . employment or ad-

decision even if it had not allowed gender to play such a role. This balance of burdens is the direct result of Title VII's balance of rights.

Our holding casts no shadow on *Burdine*, in which we decided that, even after a plaintiff has made out a prima facie case of discrimination under Title VII, the burden of persuasion does not shift to the employer to show that its stated legitimate reason for the employment decision was the true reason. 450 U. S., at 256–258. We stress, first, that nei-

---

vancement or was suspended or discharged *for any reason other than* discrimination on account of race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–5(g) (emphasis added). We do not take this provision to mean that a court inevitably can find a violation of the statute without having considered whether the employment decision would have been the same absent the impermissible motive. That would be to interpret § 706(g)—a provision defining *remedies*—to influence the substantive commands of the statute. We think that this provision merely limits courts' authority to award affirmative relief in those circumstances in which a violation of the statute is not dependent upon the effect of the employer's discriminatory practices on a particular employee, as in pattern-or-practice suits and class actions. "The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while 'at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.'" *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 876 (1984), quoting *Teamsters* v. *United States*, 431 U. S. 324, 360, n. 46 (1977).

Without explicitly mentioning this portion of § 706(g), we have in the past held that Title VII does not authorize affirmative relief for individuals as to whom, the employer shows, the existence of systemic discrimination had no effect. See *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 772 (1976); *Teamsters* v. *United States*, *supra*, at 367–371; *East Texas Motor Freight System, Inc.* v. *Rodriguez*, 431 U. S. 395, 404, n. 9 (1977). These decisions suggest that the proper focus of § 706(g) is on claims of systemic discrimination, not on charges of individual discrimination. Cf. *NLRB* v. *Transportation Management Corp.*, 462 U. S. 393 (1983) (upholding the National Labor Relations Board's identical interpretation of § 10(c) of the National Labor Relations Act, 29 U. S. C. § 160(c), which contains language almost identical to § 706(g)).

ther court below shifted the burden of persuasion to Price Waterhouse on this question, and in fact, the District Court found that Hopkins had not shown that the firm's stated reason for its decision was pretextual. 618 F. Supp., at 1114–1115. Moreover, since we hold that the plaintiff retains the burden of persuasion on the issue whether gender played a part in the employment decision, the situation before us is not the one of "shifting burdens" that we addressed in *Burdine.* Instead, the employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another. See *NLRB* v. *Transportation Management Corp.*, 462 U. S. 393, 400 (1983).[11]

Price Waterhouse's claim that the employer does not bear any burden of proof (if it bears one at all) until the plaintiff has shown "substantial evidence that Price Waterhouse's explanation for failing to promote Hopkins was not the 'true reason' for its action" (Brief for Petitioner 20) merely restates its argument that the plaintiff in a mixed-motives case

---

[11] Given that both the plaintiff and defendant bear a burden of proof in cases such as this one, it is surprising that the dissent insists that our approach requires the employer to bear "the ultimate burden of proof." *Post*, at 288. It is, moreover, perfectly consistent to say *both* that gender was a factor in a particular decision when it was made *and* that, when the situation is viewed hypothetically and after the fact, the same decision would have been made even in the absence of discrimination. Thus, we do not see the "internal inconsistency" in our opinion that the dissent perceives. See *post*, at 285–286. Finally, where liability is imposed because an employer is unable to prove that it would have made the same decision even if it had not discriminated, this is not an imposition of liability "where sex made no difference to the outcome." *Post*, at 285. In our adversary system, where a party has the burden of proving a particular assertion and where that party is unable to meet its burden, we assume that that assertion is inaccurate. Thus, where an employer is unable to prove its claim that it would have made the same decision in the absence of discrimination, we are entitled to conclude that gender *did* make a difference to the outcome.

must squeeze her proof into *Burdine*'s framework. Where a decision was the product of a mixture of legitimate and illegitimate motives, however, it simply makes no sense to ask whether the legitimate reason was *"the* 'true reason'" (Brief for Petitioner 20 (emphasis added)) for the decision—which is the question asked by *Burdine.* See *Transportation Management, supra,* at 400, n. 5.[12] Oblivious to this last point, the dissent would insist that *Burdine*'s framework perform work that it was never intended to perform. It would require a plaintiff who challenges an adverse employment decision in which both legitimate and illegitimate considerations played a part to pretend that the decision, in fact, stemmed from a single source—for the premise of *Burdine* is that *either* a legitimate *or* an illegitimate set of considerations led to the challenged decision. To say that *Burdine*'s evidentiary scheme will not help us decide a case admittedly involving *both* kinds of considerations is not to cast aspersions on the utility of that scheme in the circumstances for which it was designed.

---

[12] Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a "pretext" case or a "mixed-motives" case from the beginning in the District Court; indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both. Discovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her. At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives. If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine,* that the employer's stated reason for its decision is pretextual. The dissent need not worry that this evidentiary scheme, if used during a jury trial, will be so impossibly confused and complex as it imagines. See, *e. g., post,* at 292. Juries long have decided cases in which defendants raised affirmative defenses. The dissent fails, moreover, to explain why the evidentiary scheme that we endorsed over 10 years ago in *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274 (1977), has not proved unworkable in that context but would be hopelessly complicated in a case brought under federal antidiscrimination statutes.

## B

In deciding as we do today, we do not traverse new ground. We have in the past confronted Title VII cases in which an employer has used an illegitimate criterion to distinguish among employees, and have held that it is the employer's burden to justify decisions resulting from that practice. When an employer has asserted that gender is a BFOQ within the meaning of § 703(e), for example, we have assumed that it is the employer who must show why it must use gender as a criterion in employment. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 332–337 (1977). In a related context, although the Equal Pay Act expressly permits employers to pay different wages to women where disparate pay is the result of a "factor other than sex," see 29 U. S. C. § 206(d)(1), we have decided that it is the employer, not the employee, who must prove that the actual disparity is not sex linked. See *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 196 (1974). Finally, some courts have held that, under Title VII as amended by the Pregnancy Discrimination Act, it is the employer who has the burden of showing that its limitations on the work that it allows a pregnant woman to perform are necessary in light of her pregnancy. See, *e. g.*, *Hayes* v. *Shelby Memorial Hospital*, 726 F. 2d 1543, 1548 (CA11 1984); *Wright* v. *Olin Corp.*, 697 F. 2d 1172, 1187 (CA4 1982). As these examples demonstrate, our assumption always has been that if an employer allows gender to affect its decision-making process, then it must carry the burden of justifying its ultimate decision. We have not in the past required women whose gender has proved relevant to an employment decision to establish the negative proposition that they would not have been subject to that decision had they been men, and we do not do so today.

We have reached a similar conclusion in other contexts where the law announces that a certain characteristic is irrelevant to the allocation of burdens and benefits. In *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977), the

plaintiff claimed that he had been discharged as a public school teacher for exercising his free-speech rights under the First Amendment. Because we did not wish to "place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing," *id.*, at 285, we concluded that such an employee "ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record." *Id.*, at 286. We therefore held that once the plaintiff had shown that his constitutionally protected speech was a "substantial" or "motivating factor" in the adverse treatment of him by his employer, the employer was obligated to prove "by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff] even in the absence of the protected conduct." *Id.*, at 287. A court that finds for a plaintiff under this standard has effectively concluded that an illegitimate motive was a "but-for" cause of the employment decision. See *Givhan* v. *Western Line Consolidated School Dist.*, 439 U. S. 410, 417 (1979). See also *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 270–271, n. 21 (1977) (applying *Mt. Healthy* standard where plaintiff alleged that unconstitutional motive had contributed to enactment of legislation); *Hunter* v. *Underwood*, 471 U. S. 222, 228 (1985) (same).

In *Transportation Management*, we upheld the NLRB's interpretation of § 10(c) of the National Labor Relations Act, which forbids a court to order affirmative relief for discriminatory conduct against a union member "if such individual was suspended or discharged for cause." 29 U. S. C. § 160(c). The Board had decided that this provision meant that once an employee had shown that his suspension or discharge was based in part on hostility to unions, it was up to the employer to prove by a preponderance of the evidence that it would have made the same decision in the absence of this impermissible motive. In such a situation, we empha-

sized, "[t]he employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing." 462 U. S., at 403.

We have, in short, been here before. Each time, we have concluded that the plaintiff who shows that an impermissible motive played a motivating part in an adverse employment decision has thereby placed upon the defendant the burden to show that it would have made the same decision in the absence of the unlawful motive. Our decision today treads this well-worn path.

## C

In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.[13] In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.

Although the parties do not overtly dispute this last proposition, the placement by Price Waterhouse of "sex stereotyping" in quotation marks throughout its brief seems to us an insinuation either that such stereotyping was not present in this case or that it lacks legal relevance. We reject both pos-

---

[13] After comparing this description of the plaintiff's proof to that offered by JUSTICE O'CONNOR's opinion concurring in the judgment, *post*, at 276–277, we do not understand why the concurrence suggests that they are meaningfully different from each other, see *post*, at 275, 277–279. Nor do we see how the inquiry that we have described is "hypothetical," see *post*, at 283, n. 1. It seeks to determine the content of the entire set of reasons for a decision, rather than shaving off one reason in an attempt to determine what the decision would have been in the absence of that consideration. The inquiry that we describe thus strikes us as a distinctly non-hypothetical one.

sibilities. As to the existence of sex stereotyping in this case, we are not inclined to quarrel with the District Court's conclusion that a number of the partners' comments showed sex stereotyping at work. See *infra*, at 255–256. As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for " '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 707, n. 13 (1978), quoting *Sprogis* v. *United Air Lines, Inc.*, 444 F. 2d 1194, 1198 (CA7 1971). An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.

Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part. In any event, the stereotyping in this case did not simply consist of stray remarks. On the contrary, Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked evaluations. This is not, as Price Waterhouse suggests, "discrimination in the air"; rather, it is, as Hopkins puts it, "discrimination brought to ground and visited upon" an employee. Brief for Respondent 30. By focusing on Hopkins' specific proof, however, we do not suggest a limitation on the possible ways

of proving that stereotyping played a motivating role in an employment decision, and we refrain from deciding here which specific facts, "standing alone," would or would not establish a plaintiff's case, since such a decision is unnecessary in this case. But see *post*, at 277 (O'CONNOR, J., concurring in judgment).

As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive.[14] Moreover, proving "'that the same decision would have been justified . . . is not the same as proving that the same decision would have been made.'" *Givhan*, 439 U. S., at 416, quoting *Ayers* v. *Western Line Consolidated School District*, 555 F. 2d 1309, 1315 (CA5 1977). An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The very premise of a mixed-motives case is that a legitimate reason was present, and indeed, in this case, Price Waterhouse already has made this showing by convincing Judge Gesell that Hopkins' interpersonal problems were a legitimate concern. The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

### III

The courts below held that an employer who has allowed a discriminatory impulse to play a motivating part in an employment decision must prove by clear and convincing evidence that it would have made the same decision in the ab-

---

[14] JUSTICE WHITE's suggestion, *post*, at 261, that the employer's own testimony as to the probable decision in the absence of discrimination is due special credence where the court has, contrary to the employer's testimony, found that an illegitimate factor played a part in the decision, is baffling.

sence of discrimination. We are persuaded that the better rule is that the employer must make this showing by a preponderance of the evidence.

Conventional rules of civil litigation generally apply in Title VII cases, see, *e. g., United States Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 716 (1983) (discrimination not to be "treat[ed] . . . differently from other ultimate questions of fact"), and one of these rules is that parties to civil litigation need only prove their case by a preponderance of the evidence. See, *e. g., Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 390 (1983). Exceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action—action more dramatic than entering an award of money damages or other conventional relief—against an individual. See *Santosky* v. *Kramer*, 455 U. S. 745, 756 (1982) (termination of parental rights); *Addington* v. *Texas*, 441 U. S. 418, 427 (1979) (involuntary commitment); *Woodby* v. *INS*, 385 U. S. 276 (1966) (deportation); *Schneiderman* v. *United States*, 320 U. S. 118, 122, 125 (1943) (denaturalization). Only rarely have we required clear and convincing proof where the action defended against seeks only conventional relief, see, *e. g., Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 342 (1974) (defamation), and we find it significant that in such cases it was the defendant rather than the plaintiff who sought the elevated standard of proof—suggesting that this standard ordinarily serves as a shield rather than, as Hopkins seeks to use it, as a sword.

It is true, as Hopkins emphasizes, that we have noted the "clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555, 562 (1931). Likewise, an Equal Employment Opportunity Commission (EEOC) regulation does require federal agencies proved to have violated

Title VII to show by clear and convincing evidence that an individual employee is not entitled to relief. See 29 CFR § 1613.271(c)(2) (1988). And finally, it is true that we have emphasized the importance of make-whole relief for victims of discrimination. See *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975). Yet each of these sources deals with the proper determination of relief rather than with the initial finding of liability. This is seen most easily in the EEOC's regulation, which operates only after an agency or the EEOC has found that "an employee of the agency was discriminated against." See 29 CFR § 1613.271(c) (1988). Because we have held that, by proving that it would have made the same decision in the absence of discrimination, the employer may avoid a finding of liability altogether and not simply avoid certain equitable relief, these authorities do not help Hopkins to show why we should elevate the standard of proof for an employer in this position.

Significantly, the cases from this Court that most resemble this one, *Mt. Healthy* and *Transportation Management*, did not require clear and convincing proof. *Mt. Healthy*, 429 U. S., at 287; *Transportation Management*, 462 U. S., at 400, 403. We are not inclined to say that the public policy against firing employees because they spoke out on issues of public concern or because they affiliated with a union is less important than the policy against discharging employees on the basis of their gender. Each of these policies is vitally important, and each is adequately served by requiring proof by a preponderance of the evidence.

Although Price Waterhouse does not concretely tell us how its proof was preponderant even if it was not clear and convincing, this general claim is implicit in its request for the less stringent standard. Since the lower courts required Price Waterhouse to make its proof by clear and convincing evidence, they did not determine whether Price Waterhouse had proved by a *preponderance of the evidence* that it would have placed Hopkins' candidacy on hold even if it had not per-

mitted sex-linked evaluations to play a part in the decision-making process. Thus, we shall remand this case so that that determination can be made.

## IV

The District Court found that sex stereotyping "was permitted to play a part" in the evaluation of Hopkins as a candidate for partnership. 618 F. Supp., at 1120. Price Waterhouse disputes both that stereotyping occurred and that it played any part in the decision to place Hopkins' candidacy on hold. In the firm's view, in other words, the District Court's factual conclusions are clearly erroneous. We do not agree.

In finding that some of the partners' comments reflected sex stereotyping, the District Court relied in part on Dr. Fiske's expert testimony. Without directly impugning Dr. Fiske's credentials or qualifications, Price Waterhouse insinuates that a social psychologist is unable to identify sex stereotyping in evaluations without investigating whether those evaluations have a basis in reality. This argument comes too late. At trial, counsel for Price Waterhouse twice assured the court that he did not question Dr. Fiske's expertise (App. 25) and failed to challenge the legitimacy of her discipline. Without contradiction from Price Waterhouse, Fiske testified that she discerned sex stereotyping in the partners' evaluations of Hopkins, and she further explained that it was part of her business to identify stereotyping in written documents. *Id.*, at 64. We are not inclined to accept petitioner's belated and unsubstantiated characterization of Dr. Fiske's testimony as "gossamer evidence" (Brief for Petitioner 20) based only on "intuitive hunches" (*id.*, at 44) and of her detection of sex stereotyping as "intuitively divined" (*id.*, at 43). Nor are we disposed to adopt the dissent's dismissive attitude toward Dr. Fiske's field of study and toward her own professional integrity, see *post*, at 293–294, n. 5.

Indeed, we are tempted to say that Dr. Fiske's expert testimony was merely icing on Hopkins' cake. It takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring "a course at charm school." Nor, turning to Thomas Beyer's memorable advice to Hopkins, does it require expertise in psychology to know that, if an employee's flawed "interpersonal skills" can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism.[15]

Price Waterhouse also charges that Hopkins produced no evidence that sex stereotyping played a role in the decision to place her candidacy on hold. As we have stressed, however, Hopkins showed that the partnership solicited evaluations from all of the firm's partners; that it generally relied very heavily on such evaluations in making its decision; that some of the partners' comments were the product of stereotyping; and that the firm in no way disclaimed reliance on those particular comments, either in Hopkins' case or in the past. Certainly a plausible—and, one might say, inevitable—conclusion to draw from this set of circumstances is that the Policy Board in making its decision did in fact take into account all of the partners' comments, including the comments that were motivated by stereotypical notions about women's proper deportment.[16]

---

[15] We reject the claim, advanced by Price Waterhouse here and by the dissenting judge below, that the District Court clearly erred in finding that Beyer was "responsible for telling [Hopkins] what problems the Policy Board had identified with her candidacy." 618 F. Supp., at 1117. This conclusion was reasonable in light of the testimony at trial of a member of both the Policy Board and the Admissions Committee, who stated that he had "no doubt" that Beyer would discuss with Hopkins the reasons for placing her candidacy on hold and that Beyer "knew exactly where the problems were" regarding Hopkins. Tr. 316.

[16] We do not understand the dissenters' dissatisfaction with the District Judge's statements regarding the failure of Price Waterhouse to "sensitize" partners to the dangers of sexism. *Post*, at 294. Made in the con-

Price Waterhouse concedes that the proof in *Transportation Management* adequately showed that the employer there had relied on an impermissible motivation in firing the plaintiff. Brief for Petitioner 45. But the only evidence in that case that a discriminatory motive contributed to the plaintiff's discharge was that the employer harbored a grudge toward the plaintiff on account of his union activity; there was, contrary to Price Waterhouse's suggestion, no direct evidence that that grudge had played a role in the decision, and, in fact, the employer had given other reasons in explaining the plaintiff's discharge. See 462 U. S., at 396. If the partnership considers that proof sufficient, we do not know why it takes such vehement issue with Hopkins' proof.

Nor is the finding that sex stereotyping played a part in the Policy Board's decision undermined by the fact that many of the suspect comments were made by supporters rather than detractors of Hopkins. A negative comment, even when made in the context of a generally favorable review, nevertheless may influence the decisionmaker to think less highly of the candidate; the Policy Board, in fact, did not simply tally the "yesses" and "noes" regarding a candidate, but carefully reviewed the content of the submitted comments. The additional suggestion that the comments were made by "persons outside the decisionmaking chain" (Brief for Petitioner 48)—and therefore could not have harmed Hopkins— simply ignores the critical role that partners' comments played in the Policy Board's partnership decisions.

Price Waterhouse appears to think that we cannot affirm the factual findings of the trial court without deciding that, instead of being overbearing and aggressive and curt, Hopkins is, in fact, kind and considerate and patient. If this is indeed its impression, petitioner misunderstands the theory

---

text of determining that Price Waterhouse had not disclaimed reliance on sex-based evaluations, and following the judge's description of the firm's history of condoning such evaluations, the judge's remarks seem to us justified.

on which Hopkins prevailed. The District Judge acknowledged that Hopkins' conduct justified complaints about her behavior as a senior manager. But he also concluded that the reactions of at least some of the partners were reactions to her as a *woman* manager. Where an evaluation is based on a subjective assessment of a person's strengths and weaknesses, it is simply not true that each evaluator will focus on, or even mention, the same weaknesses. Thus, even if we knew that Hopkins had "personality problems," this would not tell us that the partners who cast their evaluations of Hopkins in sex-based terms would have criticized her as sharply (or criticized her at all) if she had been a man. It is not our job to review the evidence and decide that the negative reactions to Hopkins were based on reality; our perception of Hopkins' character is irrelevant. We sit not to determine whether Ms. Hopkins is nice, but to decide whether the partners reacted negatively to her personality because she is a woman.

V

We hold that when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account. Because the courts below erred by deciding that the defendant must make this proof by clear and convincing evidence, we reverse the Court of Appeals' judgment against Price Waterhouse on liability and remand the case to that court for further proceedings.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

In my view, to determine the proper approach to causation in this case, we need look only to the Court's opinion in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977). In *Mt. Healthy*, a public employee was not rehired, in part

because of his exercise of First Amendment rights and in part because of permissible considerations. The Court rejected a rule of causation that focused "solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire," on the grounds that such a rule could make the employee better off by exercising his constitutional rights than by doing nothing at all. *Id.*, at 285. Instead, the Court outlined the following approach:

> "Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that his conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.*, at 287 (footnote omitted).

It is not necessary to get into semantic discussions on whether the *Mt. Healthy* approach is "but-for" causation in another guise or creates an affirmative defense on the part of the employer to see its clear application to the issues before us in this case. As in *Mt. Healthy*, the District Court found that the employer was motivated by both legitimate and illegitimate factors. And here, as in *Mt. Healthy*, and as the Court now holds, Hopkins was not required to prove that the illegitimate factor was the only, principal, or true reason for petitioner's action. Rather, as JUSTICE O'CONNOR states, her burden was to show that the unlawful motive was a *substantial* factor in the adverse employment action. The District Court, as its opinion was construed by the Court of Appeals, so found, 263 U. S. App. D. C. 321, 333, 334, 825 F. 2d 458, 470, 471 (1987), and I agree that the finding was supported by the record. The burden of persuasion then

should have shifted to Price Waterhouse to prove "by a preponderance of the evidence that it would have reached the same decision . . . in the absence of" the unlawful motive. *Mt. Healthy, supra,* at 287.

I agree with JUSTICE BRENNAN that applying this approach to causation in Title VII cases is not a departure from, and does not require modification of, the Court's holdings in *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981), and *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973). The Court has made clear that "mixed-motives" cases, such as the present one, are different from pretext cases such as *McDonnell Douglas* and *Burdine.* In pretext cases, "the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision." *NLRB* v. *Transportation Management Corp.,* 462 U. S. 393, 400, n. 5 (1983). In mixed-motives cases, however, there is no one "true" motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate. It can hardly be said that our decision in this case is a departure from cases that are "inapposite." *Ibid.* I also disagree with the dissent's assertion that this approach to causation is inconsistent with our statement in *Burdine* that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U. S., at 253. As we indicated in *Transportation Management Corp.,* the showing required by *Mt. Healthy* does not improperly shift from the plaintiff the ultimate burden of persuasion on whether the defendant intentionally discriminated against him or her. See 462 U. S., at 400, n. 5.

Because the Court of Appeals required Price Waterhouse to prove by clear and convincing evidence that it would have reached the same employment decision in the absence of the improper motive, rather than merely requiring proof by a preponderance of the evidence as in *Mt. Healthy,* I concur in the judgment reversing this case in part and remanding.

With respect to the employer's burden, however, the plurality seems to require, at least in most cases, that the employer submit objective evidence that the same result would have occurred absent the unlawful motivation. *Ante*, at 252. In my view, however, there is no special requirement that the employer carry its burden by objective evidence. In a mixed-motives case, where the legitimate motive found would have been ample grounds for the action taken, and the employer credibly testifies that the action would have been taken for the legitimate reasons alone, this should be ample proof. This would even more plainly be the case where the employer denies any illegitimate motive in the first place but the court finds that illegitimate, as well as legitimate, factors motivated the adverse action.*

JUSTICE O'CONNOR, concurring in the judgment.

I agree with the plurality that, on the facts presented in this case, the burden of persuasion should shift to the employer to demonstrate by a preponderance of the evidence that it would have reached the same decision concerning Ann Hopkins' candidacy absent consideration of her gender. I further agree that this burden shift is properly part of the liability phase of the litigation. I thus concur in the judgment of the Court. My disagreement stems from the plurality's conclusions concerning the substantive requirement of causation under the statute and its broad statements regarding the applicability of the allocation of the burden of proof applied in this case. The evidentiary rule the Court adopts today should be viewed as a supplement to the careful framework established by our unanimous decisions in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), and *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981), for use in cases such as this one where the employer has created uncertainty as to causation by knowingly giving

---

*I agree with the plurality that if the employer carries this burden, there has been no violation of Title VII.

substantial weight to an impermissible criterion. I write separately to explain why I believe such a departure from the *McDonnell Douglas* standard is justified in the circumstances presented by this and like cases, and to express my views as to when and how the strong medicine of requiring the employer to bear the burden of persuasion on the issue of causation should be administered.

## I

Title VII provides in pertinent part: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a) (emphasis added). The legislative history of Title VII bears out what its plain language suggests: a substantive violation of the statute only occurs when consideration of an illegitimate criterion is the "but-for" cause of an adverse employment action. The legislative history makes it clear that Congress was attempting to eradicate discriminatory actions in the employment setting, not mere discriminatory thoughts. Critics of the bill that became Title VII labeled it a "thought control bill," and argued that it created a "punishable crime that does not require an illegal external act as a basis for judgment." 100 Cong. Rec. 7254 (1964) (remarks of Sen. Ervin). Senator Case, whose views the plurality finds so persuasive elsewhere, responded:

> "The man must do or fail to do something in regard to employment. There must be some specific external act, more than a mental act. Only if he does the act because of the grounds stated in the bill would there be any legal consequences." *Ibid.*

Thus, I disagree with the plurality's dictum that the words "because of" do not mean "but-for" causation; manifestly they

do. See *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 499 (1986) (WHITE, J., dissenting) ("[T]he general policy under Title VII is to limit relief for racial discrimination in employment practices to actual victims of the discrimination"). We should not, and need not, deviate from that policy today. The question for decision in this case is what allocation of the burden of persuasion on the issue of causation best conforms with the intent of Congress and the purposes behind Title VII.

The evidence of congressional intent as to which party should bear the burden of proof on the issue of causation is considerably less clear. No doubt, as a general matter, Congress assumed that the plaintiff in a Title VII action would bear the burden of proof on the elements critical to his or her case. As the dissent points out, *post*, at 287, n. 3, the interpretative memorandum submitted by sponsors of Title VII indicates that "the plaintiff, *as in any civil case*, would have the burden of proving that discrimination had occurred." 110 Cong. Rec. 7214 (1964) (emphasis added). But in the area of tort liability, from whence the dissent's "but-for" standard of causation is derived, see *post*, at 282, the law has long recognized that in certain "civil cases" leaving the burden of persuasion on the plaintiff to prove "but-for" causation would be both unfair and destructive of the deterrent purposes embodied in the concept of duty of care. Thus, in multiple causation cases, where a breach of duty has been established, the common law of torts has long shifted the burden of proof to multiple defendants to prove that their negligent actions were not the "but-for" cause of the plaintiff's injury. See *e. g.*, *Summers* v. *Tice*, 33 Cal. 2d 80, 84–87, 199 P. 2d 1, 3–4 (1948). The same rule has been applied where the effect of a defendant's tortious conduct combines with a force of unknown or innocent origin to produce the harm to the plaintiff. See *Kingston* v. *Chicago & N. W. R. Co.*, 191 Wis. 610, 616, 211 N. W. 913, 915 (1927) ("Granting that the union of that fire [caused by defendant's

negligence] with another of natural origin, or with another of much greater proportions, is available as a defense, the burden is on the defendant to show that . . . the fire set by him was not the proximate cause of the damage"). See also 2 J. Wigmore, Select Cases on the Law of Torts § 153, p. 865 (1912) ("When two or more persons by their acts are possibly the sole cause of a harm, or when two or more acts of the same person are possibly the sole cause, and the plaintiff has introduced evidence that one of the two persons, or one of the same person's two acts, is culpable, then the defendant has the burden of proving that the other person, or his other act, was the sole cause of the harm").

While requiring that the plaintiff in a tort suit or a Title VII action prove that the defendant's "breach of duty" was the "but-for" cause of an injury does not generally hamper effective enforcement of the policies behind those causes of action,

> "at other times the [but-for] test demands the impossible. It challenges the imagination of the trier to probe into a purely fanciful and unknowable state of affairs. He is invited to make an estimate concerning facts that concededly never existed. The very uncertainty as to what *might* have happened opens the door wide for conjecture. But when conjecture is demanded it can be given a direction that is consistent with the policy considerations that underlie the controversy." Malone, Ruminations on Cause-In-Fact, 9 Stan. L. Rev. 60, 67 (1956).

Like the common law of torts, the statutory employment "tort" created by Title VII has two basic purposes. The first is to deter conduct which has been identified as contrary to public policy and harmful to society as a whole. As we have noted in the past, the award of backpay to a Title VII plaintiff provides "the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as

possible, the last vestiges" of discrimination in employment. *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417–418 (1975) (citation omitted). The second goal of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*, at 418.

Both these goals are reflected in the elements of a disparate treatment action. There is no doubt that Congress considered reliance on gender or race in making employment decisions an evil in itself. As Senator Clark put it, "[t]he bill simply eliminates consideration of color [or other forbidden criteria] from the decision to hire or promote." 110 Cong. Rec. 7218 (1964). See also *id.*, at 13088 (remarks of Sen. Humphrey) ("What the bill does . . . is simply to make it an illegal practice to use race as a factor in denying employment"). Reliance on such factors is exactly what the threat of Title VII liability was meant to deter. While the main concern of the statute was with employment opportunity, Congress was certainly not blind to the stigmatic harm which comes from being evaluated by a process which treats one as an inferior by reason of one's race or sex. This Court's decisions under the Equal Protection Clause have long recognized that whatever the final outcome of a decisional process, the inclusion of race or sex as a consideration within it harms both society and the individual. See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989). At the same time, Congress clearly conditioned legal liability on a determination that the consideration of an illegitimate factor *caused* a tangible employment injury of some kind.

Where an individual disparate treatment plaintiff has shown by a preponderance of the evidence that an illegitimate criterion was a *substantial* factor in an adverse employment decision, the deterrent purpose of the statute has clearly been triggered. More importantly, as an evidentiary matter, a reasonable factfinder could conclude that absent further explanation, the employer's discriminatory motivation "caused" the employment decision. The employer has

not yet been shown to be a violator, but neither is it entitled to the same presumption of good faith concerning its employment decisions which is accorded employers facing only circumstantial evidence of discrimination.  Both the policies behind the statute, and the evidentiary principles developed in the analogous area of causation in the law of torts, suggest that at this point the employer may be required to convince the factfinder that, despite the smoke, there is no fire.

We have given recognition to these principles in our cases which have discussed the "remedial phase" of class action disparate treatment cases.  Once the class has established that discrimination against a protected group was essentially the employer's "standard practice," there has been harm to the group and injunctive relief is appropriate.  But as to the individual members of the class, the liability phase of the litigation is not complete.  See *Dillon* v. *Coles*, 746 F. 2d 998, 1004 (CA3 1984) ("It is misleading to speak of the additional proof required by an individual class member for relief as being a part of the damage phase, that evidence is actually an element of the liability portion of the case") (footnote omitted).  Because the class has already demonstrated that, as a rule, illegitimate factors were considered in the employer's decisions, the burden shifts to the employer "to demonstrate that the individual applicant was denied an employment opportunity for legitimate reasons."  *Teamsters* v. *United States*, 431 U. S. 324, 362 (1977).  See also *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 772 (1976).

The individual members of a class action disparate treatment case stand in much the same position as Ann Hopkins here.  There has been a strong showing that the employer has done exactly what Title VII forbids, but the connection between the employer's illegitimate motivation and any injury to the individual plaintiff is unclear.  At this point calling upon the employer to show that despite consideration of illegitimate factors the individual plaintiff would not have been hired or promoted in any event hardly seems "unfair" or

contrary to the substantive command of the statute. In fact, an individual plaintiff who has shown that an illegitimate factor played a substantial role in the decision in his or her case has proved *more* than the class member in a *Teamsters* type action. The latter receives the benefit of a burden shift to the defendant based on the *likelihood* that an illegitimate criterion was a factor in the individual employment decision.

There is a tension between the *Franks* and *Teamsters* line of decisions and the individual disparate treatment cases cited by the dissent. See *post*, at 286–289. Logically, under the dissent's view, each member of a disparate treatment class action would have to show "but-for" causation as to his or her individual employment decision, since it is not an element of the pattern or practice proof of the entire class and it is statutorily mandated that the plaintiff bear the burden of proof on this issue throughout the litigation. While the Court has properly drawn a distinction between the elements of a class action claim and an individual disparate treatment claim, see *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 873–878 (1984), and I do not suggest the wholesale transposition of rules from one setting to the other, our decisions in *Teamsters* and *Franks* do indicate a recognition that presumptions shifting the burden of persuasion based on evidentiary probabilities and the policies behind the statute are not alien to our Title VII jurisprudence.

Moreover, placing the burden on the defendant in this case to prove that the same decision would have been justified by legitimate reasons is consistent with our interpretation of the constitutional guarantee of equal protection. Like a disparate treatment plaintiff, one who asserts that governmental action violates the Equal Protection Clause must show that he or she is "the victim of intentional discrimination." *Burdine*, 450 U. S., at 256. Compare *post*, at 286, 289 (KENNEDY, J., dissenting), with *Washington* v. *Davis*, 426 U. S. 229, 240 (1976). In *Alexander* v. *Louisiana*, 405 U. S. 625 (1972), we dealt with a criminal defendant's allegation that

members of his race had been invidiously excluded from the grand jury which indicted him in violation of the Equal Protection Clause. In addition to the statistical evidence presented by petitioner in that case, we noted that the State's "selection procedures themselves were not racially neutral." *Id.*, at 630. Once the consideration of race in the decisional process had been established, we held that "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Id.*, at 632.

We adhered to similar principles in *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977), a case which, like this one, presented the problems of motivation and causation in the context of a multimember decisionmaking body authorized to consider a wide range of factors in arriving at its decisions. In *Arlington Heights* a group of minority plaintiffs claimed that a municipal governing body's refusal to rezone a plot of land to allow for the construction of low-income integrated housing was racially motivated. On the issue of causation, we indicated that the plaintiff was not required

> "to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the deci-

sion, this judicial deference is no longer justified."  *Id.*, at 265–266 (citation omitted).

If the strong presumption of regularity and rationality of legislative decisionmaking must give way in the face of evidence that race has played a significant part in a legislative decision, I simply cannot believe that Congress intended Title VII to accord *more* deference to a private employer in the face of evidence that its decisional process has been substantially infected by discrimination.  Indeed, where a public employee brings a "disparate treatment" claim under 42 U. S. C. § 1983 and the Equal Protection Clause the employee is entitled to the favorable evidentiary framework of *Arlington Heights*.  See, *e. g.*, *Hervey* v. *Little Rock*, 787 F. 2d 1223, 1233–1234 (CA8 1986) (applying *Arlington Heights* to public employee's claim of sex discrimination in promotion decision); *Lee* v. *Russell County Bd. of Education*, 684 F. 2d 769, 773–774 (CA11 1982) (applying *Arlington Heights* to public employees' claims of race discrimination in discharge case).  Under the dissent's reading of Title VII, Congress' extension of the coverage of the statute to public employers in 1972 has placed these employees under a less favorable evidentiary regime.  In my view, nothing in the language, history, or purpose of Title VII prohibits adoption of an evidentiary rule which places the burden of persuasion on the defendant to demonstrate that legitimate concerns would have justified an adverse employment action where the plaintiff has convinced the factfinder that a forbidden factor played a substantial role in the employment decision.  Even the dissenting judge below "[had] no quarrel with [the] principle" that "a party with one permissible motive and one unlawful one may prevail only by affirmatively proving that it would have acted as it did even if the forbidden motive were absent."  263 U. S. App. D. C. 321, 341, 825 F. 2d 458, 478 (1987) (Williams, J. dissenting).

## II

The dissent's summary of our individual disparate treatment cases to date is fair and accurate, and amply demonstrates that the rule we adopt today is at least a change in direction from some of our prior precedents. See *post*, at 286–289. We have indeed emphasized in the past that in an individual disparate treatment action the plaintiff bears the burden of persuasion throughout the litigation. Nor have we confined the word "pretext" to the narrow definition which the plurality attempts to pin on it today. See *ante*, at 244–247. *McDonnell Douglas* and *Burdine* clearly contemplated that a disparate treatment plaintiff could show that the employer's proffered explanation for an event was not "the true reason" either because it *never* motivated the employer in its employment decisions or because it did not do so in a particular case. *McDonnell Douglas* and *Burdine* assumed that the plaintiff would bear the burden of persuasion as to both these attacks, and we clearly depart from that framework today. Such a departure requires justification, and its outlines should be carefully drawn.

First, *McDonnell Douglas* itself dealt with a situation where the plaintiff presented no direct evidence that the employer had relied on a forbidden factor under Title VII in making an employment decision. The prima facie case established there was not difficult to prove, and was based only on the statistical probability that when a number of potential causes for an employment decision are eliminated an inference arises that an illegitimate factor was in fact the motivation behind the decision. See *Teamsters*, 431 U. S., at 358, n. 44 ("[T]he *McDonnell Douglas* formula does not require direct proof of discrimination"). In the face of this inferential proof, the employer's burden was deemed to be only one of production; the employer must articulate a legitimate reason for the adverse employment action. See *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 577 (1978). The plaintiff must then be given an "opportunity to demonstrate

by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." *McDonnell Douglas*, 411 U. S., at 805. Our decision in *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981), also involved the "narrow question" whether, after a plaintiff had carried the "not onerous" burden of establishing the prima facie case under *McDonnell Douglas*, the burden of persuasion should be shifted to the employer to prove that a legitimate reason for the adverse employment action existed. 450 U. S., at 250. As the discussion of *Teamsters* and *Arlington Heights* indicates, I do not think that the employer is entitled to the same presumption of good faith where there is direct evidence that it has placed substantial reliance on factors whose consideration is forbidden by Title VII.

The only individual disparate treatment case cited by the dissent which involved the kind of direct evidence of discriminatory animus with which we are confronted here is *United States Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 713–714, n. 2 (1983). The question presented to the Court in that case involved only a challenge to the elements of the prima facie case under *McDonnell Douglas* and *Burdine*, see Pet. for Cert. in *United States Postal Service Bd. of Governors* v. *Aikens*, O. T. 1981, No. 81–1044, and the question we confront today was neither briefed nor argued to the Court. As should be apparent, the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by. That the employer's burden in rebutting such an inferential case of discrimination is only one of production does not mean that the scales should be weighted in the same manner where there *is* direct evidence of intentional discrimination. Indeed, in one Age Discrimination in Employment Act case, the Court seemed to indicate that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World*

*Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 121 (1985). See also *East Texas Motor Freight System, Inc.* v. *Rodriguez,* 431 U. S. 395, 403–404, n. 9 (1977).

Second, the facts of this case, and a growing number like it decided by the Courts of Appeals, convince me that the evidentiary standard I propose is necessary to make real the promise of *McDonnell Douglas* that "[i]n the implementation of [employment] decisions, it is abundantly clear that Title VII tolerates no . . . discrimination, subtle or otherwise." 411 U. S., at 801. In this case, the District Court found that a number of the evaluations of Ann Hopkins submitted by partners in the firm overtly referred to her failure to conform to certain gender stereotypes as a factor militating against her election to the partnership. 618 F. Supp. 1109, 1116–1117 (DC 1985). The District Court further found that these evaluations were given "great weight" by the decisionmakers at Price Waterhouse. *Id.*, at 1118. In addition, the District Court found that the partner responsible for informing Hopkins of the factors which caused her candidacy to be placed on hold, indicated that her "professional" problems would be solved if she would "walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.*, at 1117 (footnote omitted). As the Court of Appeals characterized it, Ann Hopkins proved that Price Waterhouse "permitt[ed] stereotypical attitudes towards women to play a significant, though unquantifiable, role in its decision not to invite her to become a partner." 263 U. S. App. D. C., at 324, 825 F. 2d, at 461.

At this point Ann Hopkins had taken her proof as far as it could go. She had proved discriminatory input into the decisional process, and had proved that participants in the process considered her failure to conform to the stereotypes credited by a number of the decisionmakers had been a substantial factor in the decision. It is as if Ann Hopkins were sitting in the hall outside the room where partnership decisions were being made. As the partners filed in to consider

her candidacy, she heard several of them make sexist remarks in discussing her suitability for partnership.  As the decisionmakers exited the room, she was *told* by one of those privy to the decisionmaking process that her gender was a major reason for the rejection of her partnership bid.  If, as we noted in *Teamsters*, "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof," 431 U. S., at 359, n. 45, one would be hard pressed to think of a situation where it would be more appropriate to require the defendant to show that its decision would have been justified by wholly legitimate concerns.

Moreover, there is mounting evidence in the decisions of the lower courts that respondent here is not alone in her inability to pinpoint discrimination as the precise cause of her injury, despite having shown that it played a significant role in the decisional process.  Many of these courts, which deal with the evidentiary issues in Title VII cases on a regular basis, have concluded that placing the risk of nonpersuasion on the defendant in a situation where uncertainty as to causation has been created by its consideration of an illegitimate criterion makes sense as a rule of evidence and furthers the substantive command of Title VII.  See, *e. g.*, *Bell* v. *Birmingham Linen Service*, 715 F. 2d 1552, 1556 (CA11 1983) (Tjoflat, J.) ("It would be illogical, indeed ironic, to hold a Title VII plaintiff presenting direct evidence of a defendant's intent to discriminate to a more stringent burden of proof, or to allow a defendant to meet that direct proof by merely articulating, but not proving, legitimate, nondiscriminatory reasons for its action").  Particularly in the context of the professional world, where decisions are often made by collegial bodies on the basis of largely subjective criteria, requiring the plaintiff to prove that *any* one factor was the definitive cause of the decisionmakers' action may be tantamount to declaring Title VII inapplicable to such decisions.  See, *e. g.*, *Fields* v. *Clark University*, 817 F. 2d 931, 935–937

(CA1 1987) (where plaintiff produced "strong evidence" that sexist attitudes infected faculty tenure decision, burden properly shifted to defendant to show that it would have reached the same decision absent discrimination); *Thompkins* v. *Morris Brown College*, 752 F. 2d 558, 563 (CA11 1985) (direct evidence of discriminatory animus in decision to discharge college professor shifted burden of persuasion to defendant).

Finally, I am convinced that a rule shifting the burden to the defendant where the plaintiff has shown that an illegitimate criterion was a "substantial factor" in the employment decision will not conflict with other congressional policies embodied in Title VII. Title VII expressly provides that an employer need not give preferential treatment to employees or applicants of any race, color, religion, sex, or national origin in order to maintain a work force in balance with the general population. See 42 U. S. C. § 2000e–2(j). The interpretive memorandum, whose authoritative force is noted by the plurality, see *ante*, at 243, n. 8, specifically provides: "There is no requirement in title VII that an employer maintain a racial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance, whatever such a balance may be, would involve a violation of title VII because maintaining such a balance would require an employer to hire or refuse to hire on the basis of race." 110 Cong. Rec. 7213 (1964).

Last Term, in *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977 (1988), the Court unanimously concluded that the disparate impact analysis first enunciated in *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), should be extended to subjective or discretionary selection processes. At the same time a plurality of the Court indicated concern that the focus on bare statistics in the disparate impact setting could force employers to adopt "inappropriate prophylactic measures" in violation of § 2000e–2(j). The plurality went on to emphasize that in a disparate impact case, the plaintiff may not simply

point to a statistical disparity in the employer's work force. Instead, the plaintiff must identify a particular employment practice and "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." 487 U. S., at 994. The plurality indicated that "the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times." *Id.*, at 997.

I believe there are significant differences between shifting the burden of persuasion to the employer in a case resting purely on statistical proof as in the disparate impact setting and shifting the burden of persuasion in a case like this one, where an employee has demonstrated by direct evidence that an illegitimate factor played a substantial role in a particular employment decision. First, the explicit consideration of race, color, religion, sex, or national origin in making employment decisions "was the most obvious evil Congress had in mind when it enacted Title VII." *Teamsters,* 431 U. S., at 335, n. 15. While the prima facie case under *McDonnell Douglas* and the statistical showing of imbalance involved in a disparate impact case may both be indicators of discrimination or its "functional equivalent," they are not, in and of themselves, the evils Congress sought to eradicate from the employment setting. Second, shifting the burden of persuasion to the employer in a situation like this one creates no incentive to preferential treatment in violation of § 2000e–(2)(j). To avoid bearing the burden of justifying its decision, the employer need not seek racial or sexual balance in its work force; rather, all it need do is avoid substantial reliance on forbidden criteria in making its employment decisions.

While the danger of forcing employers to engage in unwarranted preferential treatment is thus less dramatic in this setting than in the situation the Court faced in *Watson,* it is far from wholly illusory. Based on its misreading of

the words "because of" in the statute, see *ante*, at 240–242, the plurality appears to conclude that if a decisional process is "tainted" by awareness of sex or race in any way, the employer has violated the statute, and Title VII thus *commands* that the burden shift to the employer to justify its decision. *Ante*, at 250–252. The plurality thus effectively reads the causation requirement out of the statute, and then replaces it with an "affirmative defense." *Ante*, at 244–247.

In my view, in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision. As the Court of Appeals noted below: "While most circuits have not confronted the question squarely, the consensus among those that have is that once a Title VII plaintiff has demonstrated by direct evidence that discriminatory animus played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination." 263 U. S. App. D. C., at 333–344, 825 F. 2d, at 470–471. Requiring that the plaintiff demonstrate that an illegitimate factor played a substantial role in the employment decision identifies those employment situations where the deterrent purpose of Title VII is most clearly implicated. As an evidentiary matter, where a plaintiff has made this type of strong showing of illicit motivation, the factfinder is entitled to presume that the employer's discriminatory animus made a difference to the outcome, absent proof to the contrary from the employer. Where a disparate treatment plaintiff has made such a showing, the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor. The employer need not isolate the sole cause for the decision; rather it must demonstrate that with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same employment

action. This evidentiary scheme essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination. Cf. *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 286 (1977). If the employer fails to carry this burden, the factfinder is justified in concluding that the decision was made "because of" consideration of the illegitimate factor and the substantive standard for liability under the statute is satisfied.

Thus, stray remarks in the workplace, while perhaps probative of sexual harassment, see *Meritor Savings Bank* v. *Vinson*, 477 U. S. 57, 63–69 (1986), cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. In addition, in my view testimony such as Dr. Fiske's in this case, standing alone, would not justify shifting the burden of persuasion to the employer. Race and gender always "play a role" in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion. For example, in the context of this case, a mere reference to "a lady candidate" might show that gender "played a role" in the decision, but by no means could support a rational factfinder's inference that the decision was made "because of" sex. What is required is what Ann Hopkins showed here: direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

It should be obvious that the threshold standard I would adopt for shifting the burden of persuasion to the defendant differs substantially from that proposed by the plurality, the plurality's suggestion to the contrary notwithstanding. See *ante*, at 250, n. 13. The plurality proceeds from the premise that the words "because of" in the statute do not embody any

causal requirement at all. Under my approach, the plaintiff must produce evidence sufficient to show that an illegitimate criterion was a substantial factor in the particular employment decision such that a reasonable factfinder could draw an inference that the decision was made "because of" the plaintiff's protected status. Only then would the burden of proof shift to the defendant to prove that the decision would have been justified by other, wholly legitimate considerations. See also *ante*, at 259–260 (WHITE, J., concurring in judgment).

In sum, because of the concerns outlined above, and because I believe that the deterrent purpose of Title VII is disserved by a rule which places the burden of proof on plaintiffs on the issue of causation in all circumstances, I would retain but supplement the framework we established in *McDonnell Douglas* and subsequent cases. The structure of the presentation of evidence in an individual disparate treatment case should conform to the general outlines we established in *McDonnell Douglas* and *Burdine*. First, the plaintiff must establish the *McDonnell Douglas* prima facie case by showing membership in a protected group, qualification for the job, rejection for the position, and that after rejection the employer continued to seek applicants of complainant's general qualifications. *McDonnell Douglas*, 411 U. S., at 802. The plaintiff should also present any direct evidence of discriminatory animus in the decisional process. The defendant should then present its case, including its evidence as to legitimate, nondiscriminatory reasons for the employment decision. As the dissent notes, under this framework, the employer "has every incentive to convince the trier of fact that the decision was lawful." *Post*, at 292, citing *Burdine*, 450 U. S., at 258. Once all the evidence has been received, the court should determine whether the *McDonnell Douglas* or *Price Waterhouse* framework properly applies to the evidence before it. If the plaintiff has failed to satisfy the *Price Waterhouse* threshold, the case should be decided under the principles enunciated in *McDonnell Douglas* and *Burdine*,

with the plaintiff bearing the burden of persuasion on the ultimate issue whether the employment action was taken because of discrimination. In my view, such a system is both fair and workable, and it calibrates the evidentiary requirements demanded of the parties to the goals behind the statute itself.

I agree with the dissent, see *post*, at 293, n. 4, that the evidentiary framework I propose should be available to all disparate treatment plaintiffs where an illegitimate consideration played a substantial role in an adverse employment decision. The Court's allocation of the burden of proof in *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 626–627 (1987), rested squarely on "the analytical framework set forth in *McDonnell Douglas*," *id.*, at 626, which we alter today. It would be odd to say the least if the evidentiary rules applicable to Title VII actions were themselves dependent on the gender or the skin color of the litigants. But see *ante*, at 239, n. 3.

In this case, I agree with the plurality that petitioner should be called upon to show that the outcome would have been the same if respondent's professional merit had been its only concern. On remand, the District Court should determine whether Price Waterhouse has shown by a preponderance of the evidence that if gender had not been part of the process, its employment decision concerning Ann Hopkins would nonetheless have been the same.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Today the Court manipulates existing and complex rules for employment discrimination cases in a way certain to result in confusion. Continued adherence to the evidentiary scheme established in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), and *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981), is a wiser course than creation of more disarray in an area of the law already difficult for the bench and bar, and so I must dissent.

Before turning to my reasons for disagreement with the Court's disposition of the case, it is important to review the actual holding of today's decision. I read the opinions as establishing that in a limited number of cases Title VII plaintiffs, by presenting direct and substantial evidence of discriminatory animus, may shift the burden of persuasion to the defendant to show that an adverse employment decision would have been supported by legitimate reasons. The shift in the burden of persuasion occurs only where a plaintiff proves by direct evidence that an unlawful motive was a substantial factor actually relied upon in making the decision. *Ante*, at 276–277 (opinion of O'CONNOR, J.); *ante*, at 259–260 (opinion of WHITE, J.). As the opinions make plain, the evidentiary scheme created today is not for every case in which a plaintiff produces evidence of stray remarks in the workplace. *Ante*, at 251 (opinion of BRENNAN, J.); *ante*, at 277 (opinion of O'CONNOR, J.).

Where the plaintiff makes the requisite showing, the burden that shifts to the employer is to show that legitimate employment considerations would have justified the decision without reference to any impermissible motive. *Ante*, at 260–261 (opinion of WHITE, J.); *ante*, at 278 (opinion of O'CONNOR, J.). The employer's proof on the point is to be presented and reviewed just as with any other evidentiary question: the Court does not accept the plurality's suggestion that an employer's evidence need be "objective" or otherwise out of the ordinary. *Ante*, at 261 (opinion of WHITE, J.).

In sum, the Court alters the evidentiary framework of *McDonnell Douglas* and *Burdine* for a closely defined set of cases. Although JUSTICE O'CONNOR advances some thoughtful arguments for this change, I remain convinced that it is unnecessary and unwise. More troubling is the plurality's rationale for today's decision, which includes a number of unfortunate pronouncements on both causation and methods of proof in employment discrimination cases. To demonstrate the defects in the plurality's reasoning, it is nec-

essary to discuss, first, the standard of causation in Title VII cases, and, second, the burden of proof.

I

The plurality describes this as a case about the standard of *causation* under Title VII, *ante*, at 237, but I respectfully suggest that the description is misleading. Much of the plurality's rhetoric is spent denouncing a "but-for" standard of causation. The theory of Title VII liability the plurality adopts, however, essentially incorporates the but-for standard. The importance of today's decision is not the standard of causation it employs, but its shift to the defendant of the burden of proof. The plurality's causation analysis is misdirected, for it is clear that, whoever bears the burden of proof on the issue, Title VII liability requires a finding of but-for causation. See also *ante*, at 261, and n. (opinion of WHITE, J.); *ante*, at 262–263 (opinion of O'CONNOR, J.).

The words of Title VII are not obscure. The part of the statute relevant to this case provides:

> "It shall be an unlawful employment practice for an employer—
>
> "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1) (emphasis added).

By any normal understanding, the phrase "because of" conveys the idea that the motive in question made a difference to the outcome. We use the words this way in everyday speech. And assuming, as the plurality does, that we ought to consider the interpretive memorandum prepared by the statute's drafters, we find that this is what the words meant to them as well. "To discriminate is to make a distinction, to make a difference in treatment or favor." 110 Cong. Rec. 7213 (1964). Congress could not have chosen a clearer way

to indicate that proof of liability under Title VII requires a showing that race, color, religion, sex, or national origin caused the decision at issue.

Our decisions confirm that Title VII is not concerned with the mere presence of impermissible motives; it is directed to employment decisions that result from those motives. The verbal formulae we have used in our precedents are synonymous with but-for causation. Thus we have said that providing different insurance coverage to male and female employees violates the statute by treating the employee "'in a manner which but-for that person's sex would be different.'" *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 683 (1983), quoting *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 711 (1978). We have described the relevant question as whether the employment decision was "based on" a discriminatory criterion, *Teamsters* v. *United States*, 431 U. S. 324, 358 (1977), or whether the particular employment decision at issue was "made on the basis of" an impermissible factor, *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 875 (1984).

What we term "but-for" cause is the least rigorous standard that is consistent with the approach to causation our precedents describe. If a motive is not a but-for cause of an event, then by definition it did not make a difference to the outcome. The event would have occurred just the same without it. Common-law approaches to causation often require proof of but-for cause as a starting point toward proof of legal cause. The law may require more than but-for cause, for instance proximate cause, before imposing liability. Any standard less than but-for, however, simply represents a decision to impose liability without causation. As Dean Prosser puts it, "[a]n act or omission is not regarded as a cause of an event if the particular event would have occurred without it." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984).

One of the principal reasons the plurality decision may sow confusion is that it claims Title VII liability is unrelated to but-for causation, yet it adopts a but-for standard once it has placed the burden of proof as to causation upon the employer. This approach conflates the question whether causation must be shown with the question of how it is to be shown. Because the plurality's theory of Title VII causation is ultimately consistent with a but-for standard, it might be said that my disagreement with the plurality's comments on but-for cause is simply academic. See *ante*, at 259 (opinion of WHITE, J.). But since those comments seem to influence the decision, I turn now to that part of the plurality's analysis.

The plurality begins by noting the quite unremarkable fact that Title VII is written in the present tense. *Ante*, at 240–241. It is unlawful "to fail" or "to refuse" to provide employment benefits on the basis of sex, not "to have failed" or "to have refused" to have done so. The plurality claims that the present tense excludes a but-for inquiry as the relevant standard because but-for causation is necessarily concerned with a hypothetical inquiry into how a past event would have occurred absent the contested motivation. This observation, however, tells us nothing of particular relevance to Title VII or the cause of action it creates. I am unaware of any federal prohibitory statute that is written in the past tense. Every liability determination, including the novel one constructed by the plurality, necessarily is concerned with the examination of a past event.[1] The plurality's analysis of verb tense serves only to divert attention from the causation requirement that is made part of the statute by the "because

---

[1] The plurality's description of its own standard is both hypothetical and retrospective. The inquiry seeks to determine whether "if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman." *Ante*, at 250.

of" phrase. That phrase, I respectfully submit, embodies a rather simple concept that the plurality labors to ignore.[2]

We are told next that but-for cause is not required, since the words "because of" do not mean *solely because of.* *Ante*, at 241. No one contends, however, that sex must be the sole cause of a decision before there is a Title VII violation. This is a separate question from whether consideration of sex must be *a* cause of the decision. Under the accepted approach to causation that I have discussed, sex is a cause for the employment decision whenever, either by itself or in combination with other factors, it made a difference to the decision. Discrimination need not be the sole cause in order for liability to arise, but merely a necessary element of the set of factors that caused the decision, *i. e.*, a but-for cause. See *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 282, n. 10 (1976). The plurality seems to say that since we know the words "because of" do not mean "solely because of," they must not mean "because of" at all. This does not follow, as a matter of either semantics or logic.

The plurality's reliance on the "bona fide occupational qualification" (BFOQ) provisions of Title VII, 42 U. S. C. § 2000e–2(e), is particularly inapt. The BFOQ provisions allow an employer, in certain cases, to make an employment decision of which it is conceded that sex is the cause. That sex may be the legitimate cause of an employment decision where gender is a BFOQ is consistent with the opposite com-

---

[2] The plurality's discussion of overdetermined causes only highlights the error of its insistence that but-for is not the substantive standard of causation under Title VII. The opinion discusses the situation where two physical forces move an object, and either force acting alone would have moved the object. *Ante*, at 241. Translated to the context of Title VII, this situation would arise where an employer took an adverse action in reliance both on sex and on legitimate reasons, and *either* the illegitimate or the legitimate reason standing alone would have produced the action. If this state of affairs is proved to the factfinder, there will be no liability under the plurality's own test, for the same decision would have been made had the illegitimate reason never been considered.

mand that a decision caused by sex in any other case justifies the imposition of Title VII liability. This principle does not support, however, the novel assertion that a violation has occurred where sex made no difference to the outcome.

The most confusing aspect of the plurality's analysis of causation and liability is its internal inconsistency. The plurality begins by saying: "When . . . an employer considers both gender and legitimate factors at the time of making a decision, that decision was 'because of' sex and the other, legitimate considerations—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account." *Ante*, at 241. Yet it goes on to state that "an employer shall not be liable if it can prove that, even if it had not taken gender into account, it would have come to the same decision." *Ante*, at 242.

Given the language of the statute, these statements cannot both be true. Title VII unambiguously states that an employer who makes decisions "because of" sex has violated the statute. The plurality's first statement therefore appears to indicate that an employer who considers illegitimate reasons when making a decision is a violator. But the opinion then tells us that the employer who shows that the same decision would have been made absent consideration of sex is *not* a violator. If the second statement is to be reconciled with the language of Title VII, it must be that a decision that would have been the same absent consideration of sex was not made "because of" sex. In other words, there is no violation of the statute absent but-for causation. The plurality's description of the "same decision" test it adopts supports this view. The opinion states that "[a] court that finds for a plaintiff under this standard has effectively concluded that an illegitimate motive was a 'but-for' cause of the employment decision," *ante*, at 249, and that this "is not an imposition of liability 'where sex made no difference to the outcome,'" *ante*, at 246, n. 11.

The plurality attempts to reconcile its internal inconsistency on the causation issue by describing the employer's showing as an "affirmative defense." This is nothing more than a label, and one not found in the language or legislative history of Title VII. Section 703(a)(1) is the statutory basis of the cause of action, and the Court is obligated to explain how its disparate-treatment decisions are consistent with the terms of § 703(a)(1), not with general themes of legislative history or with other parts of the statute that are plainly inapposite. While the test ultimately adopted by the plurality may not be inconsistent with the terms of § 703(a)(1), see *infra*, at 292, the same cannot be said of the plurality's reasoning with respect to causation. As JUSTICE O'CONNOR describes it, the plurality "reads the causation requirement out of the statute, and then replaces it with an 'affirmative defense.'" *Ante*, at 276. Labels aside, the import of today's decision is not that Title VII liability can arise without but-for causation, but that in certain cases it is not the plaintiff who must prove the presence of causation, but the defendant who must prove its absence.

## II

We established the order of proof for individual Title VII disparate-treatment cases in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), and reaffirmed this allocation in *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981). Under *Burdine*, once the plaintiff presents a prima facie case, an inference of discrimination arises. The employer must rebut the inference by articulating a legitimate nondiscriminatory reason for its action. The final burden of persuasion, however, belongs to the plaintiff. *Burdine* makes clear that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*, at 253. See also *Board of Trustees of Keene State College* v.

*Sweeney,* 439 .U. S. 24, 29 (1978) (STEVENS, J., dissenting).[3]
I would adhere to this established evidentiary framework,
which provides the appropriate standard for this and other
individual disparate-treatment cases. Today's creation of a
new set of rules for "mixed-motives" cases is not mandated
by the statute itself. The Court's attempt at refinement
provides limited practical benefits at the cost of confusion and
complexity, with the attendant risk that the trier of fact will
misapprehend the controlling legal principles and reach an in-
correct decision.

In view of the plurality's treatment of *Burdine* and our
other disparate-treatment cases, it is important first to state
why those cases are dispositive here. The plurality tries to
reconcile its approach with *Burdine* by announcing that it ap-
plies only to a "pretext" case, which it defines as a case in
which the plaintiff attempts to prove that the employer's
proffered explanation is itself false. *Ante,* at 245–247, and
n. 11. This ignores the language of *Burdine,* which states
that a plaintiff may succeed in meeting her ultimate burden of
persuasion *"either* directly by persuading the court that a dis-
criminatory reason more likely motivated the employer or in-
directly by showing that the employer's proffered explana-
tion is unworthy of credence." 450 U. S., at 256 (emphasis
added). Under the first of these two alternative methods, a
plaintiff meets her burden if she can "persuade the court that
the employment decision more likely than not was motivated
by a discriminatory reason." *United States Postal Service
Bd. of Governors* v. *Aikens,* 460 U. S. 711, 717–718 (1983)

---

[3] The interpretive memorandum on which the plurality relies makes
plain that "the plaintiff, as in any civil case, would have the burden of prov-
ing that discrimination had occurred." 110 Cong. Rec. 7214 (1964). Cou-
pled with its earlier definition of discrimination, the memorandum tells us
that the plaintiff bears the burden of showing that an impermissible motive
"made a difference" in the treatment of the plaintiff. This is none other
than the traditional requirement that the plaintiff show but-for cause.

(BLACKMUN, J., concurring). The plurality makes no attempt to address this aspect of our cases.

Our opinions make plain that *Burdine* applies to all individual disparate-treatment cases, whether the plaintiff offers direct proof that discrimination motivated the employer's actions or chooses the indirect method of showing that the employer's proffered justification is false, that is to say, a pretext. See *Aikens, supra*, at 714, n. 3 ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence"). The plurality is mistaken in suggesting that the plaintiff in a so-called "mixed-motives" case will be disadvantaged by having to "squeeze her proof into *Burdine*'s framework." *Ante*, at 247. As we acknowledged in *McDonnell Douglas*, "[t]he facts necessarily will vary in Title VII cases," and the specification of the prima facie case set forth there "is not necessarily applicable in every respect to differing factual situations." 411 U. S., at 802, n. 13. The framework was "never intended to be rigid, mechanized, or ritualistic." *Aikens, supra*, at 715. *Burdine* compels the employer to come forward with its explanation of the decision and permits the plaintiff to offer evidence under either of the logical methods for proof of discrimination. This is hardly a framework that confines the plaintiff; still less is it a justification for saying that the ultimate burden of proof must be on the employer in a mixed-motives case. *Burdine* provides an orderly and adequate way to place both inferential and direct proof before the factfinder for a determination whether intentional discrimination has caused the employment decision. Regardless of the character of the evidence presented, we have consistently held that the ultimate burden "remains at all times with the plaintiff." *Burdine, supra*, at 253.

*Aikens* illustrates the point. There, the evidence showed that the plaintiff, a black man, was far more qualified than any of the white applicants promoted ahead of him. More important, the testimony showed that "the person responsible for the promotion decisions at issue had made numerous

derogatory comments about blacks in general and Aikens in particular." 460 U. S., at 713–714, n. 2. Yet the Court in *Aikens* reiterated that the case was to be tried under the proof scheme of *Burdine*. JUSTICE BRENNAN and JUSTICE BLACKMUN concurred to stress that the plaintiff could prevail under the *Burdine* scheme in either of two ways, one of which was directly to persuade the court that the employment decision was motivated by discrimination. 460 U. S., at 718. *Aikens* leaves no doubt that the so-called "pretext" framework of *Burdine* has been considered to provide a flexible means of addressing all individual disparate-treatment claims.

Downplaying the novelty of its opinion, the plurality claims to have followed a "well-worn path" from our prior cases. The path may be well worn, but it is in the wrong forest. The plurality again relies on Title VII's BFOQ provisions, under which an employer bears the burden of justifying the use of a sex-based employment qualification. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 332–337 (1977). In the BFOQ context this is a sensible, indeed necessary, allocation of the burden, for there by definition sex is the but-for cause of the employment decision and the only question remaining is how the employer can justify it. The same is true of the plurality's citations to Pregnancy Discrimination Act cases, *ante*, at 248. In such cases there is no question that pregnancy was the cause of the disputed action. The Pregnancy Discrimination Act and BFOQ cases tell us nothing about the case where the employer claims not that a sex-based decision was justified, but that the decision was not sex-based at all.

Closer analogies to the plurality's new approach are found in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977), and *NRLB* v. *Transportation Management Corp.*, 462 U. S. 393 (1983), but these cases were decided in different contexts. *Mt. Healthy* was a First Amendment case involving the firing of a teacher, and *Transportation Management* involved review of the NLRB's interpretation of the National Labor Re-

lations Act. The *Transportation Management* decision was based on the deference that the Court traditionally accords NLRB interpretations of the statutes it administers. See 462 U. S., at 402–403. Neither case therefore tells us why the established *Burdine* framework should not continue to govern the order of proof under Title VII.

In contrast to the plurality, JUSTICE O'CONNOR acknowledges that the approach adopted today is a "departure from the *McDonnell Douglas* standard." *Ante*, at 262. Although her reasons for supporting this departure are not without force, they are not dispositive. As JUSTICE O'CONNOR states, the most that can be said with respect to the Title VII itself is that "nothing in the language, history, or purpose of Title VII *prohibits* adoption" of the new approach. *Ante*, at 269 (emphasis added). JUSTICE O'CONNOR also relies on analogies from the common law of torts, other types of Title VII litigation, and our equal protection cases. These analogies demonstrate that shifts in the burden of proof are not unprecedented in the law of torts or employment discrimination. Nonetheless, I believe continued adherence to the *Burdine* framework is more consistent with the statutory mandate. Congress' manifest concern with preventing imposition of liability in cases where discriminatory animus did not actually cause an adverse action, see *ante*, at 262 (opinion of O'CONNOR, J.), suggests to me that an affirmative showing of causation should be required. And the most relevant portion of the legislative history supports just this view. See n. 3, *supra*. The limited benefits that are likely to be produced by today's innovation come at the sacrifice of clarity and practical application.

The potential benefits of the new approach, in my view, are overstated. First, the Court makes clear that the *Price Waterhouse* scheme is applicable only in those cases where the plaintiff has produced direct and substantial proof that an impermissible motive was relied upon in making the decision at issue. The burden shift properly will be found to apply in

only a limited number of employment discrimination cases. The application of the new scheme, furthermore, will make a difference only in a smaller subset of cases. The practical importance of the burden of proof is the "risk of nonpersuasion," and the new system will make a difference only where the evidence is so evenly balanced that the factfinder cannot say that either side's explanation of the case is "more likely" true. This category will not include cases in which the allocation of the' burden of proof will be dispositive because of a complete lack of evidence on the causation issue. Cf. *Summers* v. *Tice*, 33 Cal. 2d 80, 199 P. 2d 1 (1948) (allocation of burden dispositive because no evidence of which of two negligently fired shots hit plaintiff). Rather, *Price Waterhouse* will apply only to cases in which there is substantial evidence of reliance on an impermissible motive, as well as evidence from the employer that legitimate reasons supported its action.

Although the *Price Waterhouse* system is not for every case, almost every plaintiff is certain to ask for a *Price Waterhouse* instruction, perhaps on the basis of "stray remarks" or other evidence of discriminatory animus. Trial and appellate courts will therefore be saddled with the task of developing standards for determining when to apply the burden shift. One of their new tasks will be the generation of a jurisprudence of the meaning of "substantial factor." Courts will also be required to make the often subtle and difficult distinction between "direct" and "indirect" or "circumstantial" evidence. Lower courts long have had difficulty applying *McDonnell Douglas* and *Burdine*. Addition of a second burden-shifting mechanism, the application of which itself depends on assessment of credibility and a determination whether evidence is sufficiently direct and substantial, is not likely to lend clarity to the process. The presence of an existing burden-shifting mechanism distinguishes the individual disparate-treatment case from the tort, class-action discrimination, and equal protection cases on which

JUSTICE O'CONNOR relies. The distinction makes JUSTICE WHITE's assertions that one "need look only to" *Mt. Healthy* and *Transportation Management* to resolve this case, and that our Title VII cases in this area are "inapposite," *ante*, at 258–260, at best hard to understand.

Confusion in the application of dual burden-shifting mechanisms will be most acute in cases brought under 42 U. S. C. § 1981 or the Age Discrimination in Employment Act (ADEA), where courts borrow the Title VII order of proof for the conduct of jury trials. See, *e. g.*, Note, The Age Discrimination in Employment Act of 1967 and Trial by Jury: Proposals for Change, 73 Va. L. Rev. 601 (1987) (noting high reversal rate caused by use of Title VII burden shifting in a jury setting). Perhaps such cases in the future will require a bifurcated trial, with the jury retiring first to make the credibility findings necessary to determine whether the plaintiff has proved that an impermissible factor played a substantial part in the decision, and later hearing evidence on the "same decision" or "pretext" issues. Alternatively, perhaps the trial judge will have the unenviable task of formulating a single instruction for the jury on all of the various burdens potentially involved in the case.

I do not believe the minor refinement in Title VII procedures accomplished by today's holding can justify the difficulties that will accompany it. Rather, I "remain confident that the *McDonnell Douglas* framework permits the plaintiff meriting relief to demonstrate intentional discrimination." *Burdine*, 450 U. S., at 258. Although the employer does not bear the burden of persuasion under *Burdine*, it must offer clear and reasonably specific reasons for the contested decision, and has every incentive to persuade the trier of fact that the decision was lawful. *Ibid.* Further, the suggestion that the employer should bear the burden of persuasion due to superior access to evidence has little force in the Title VII context, where the liberal discovery rules available to all litigants are supplemented by EEOC investigatory files. *Ibid.*

In sum, the *Burdine* framework provides a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *Aikens*, 460 U. S., at 715, and it should continue to govern the order of proof in Title VII disparate-treatment cases.[4]

## III

The ultimate question in every individual disparate-treatment case is whether discrimination caused the particular decision at issue. Some of the plurality's comments with respect to the District Court's findings in this case, however, are potentially misleading. As the plurality notes, the District Court based its liability determination on expert evidence that some evaluations of respondent Hopkins were based on unconscious sex stereotypes,[5] and on the fact that

---

[4] The plurality states that it disregards the special context of affirmative action. *Ante*, at 239, n. 3. It is not clear that this is possible. Some courts have held that in a suit challenging an affirmative-action plan, the question of the plan's validity need not be reached unless the plaintiff shows that the plan was a but-for cause of the adverse decision. See *McQuillen* v. *Wisconsin Education Association Council*, 830 F. 2d 659, 665 (CA7 1987), cert. denied, 485 U. S. 914 (1988). Presumably it will be easier for a plaintiff to show that consideration of race or sex pursuant to an affirmative-action plan was a substantial factor in a decision, and the court will need to move on to the question of a plan's validity. Moreover, if the structure of the burdens of proof in Title VII suits is to be consistent, as might be expected given the identical statutory language involved, today's decision suggests that plaintiffs should no longer bear the burden of showing that affirmative-action plans are illegal. See *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 626–627 (1987).

[5] The plaintiff who engages the services of Dr. Susan Fiske should have no trouble showing that sex discrimination played a part in any decision. Price Waterhouse chose not to object to Fiske's testimony, and at this late stage we are constrained to accept it, but I think the plurality's enthusiasm for Fiske's conclusions unwarranted. Fiske purported to discern stereotyping in comments that were gender neutral—*e. g.*, "overbearing and abrasive"—without any knowledge of the comments' basis in reality and without having met the speaker or subject. "To an expert of Dr. Fiske's qualifications, it seems plain that no woman could *be* overbearing, arrogant, or abrasive: any observations to that effect would necessarily

Price Waterhouse failed to disclaim reliance on these comments when it conducted the partnership review. The District Court also based liability on Price Waterhouse's failure to "make partners sensitive to the dangers [of stereotyping], to discourage comments tainted by sexism, or to investigate comments to determine whether they were influenced by stereotypes." 618 F. Supp. 1109, 1119 (DC 1985).

Although the District Court's version of Title VII liability is improper under any of today's opinions, I think it important to stress that Title VII creates no independent cause of action for sex stereotyping. Evidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent. The ultimate question, however, is whether discrimination caused the plaintiff's harm. Our cases do not support the suggestion that failure to "disclaim reliance" on stereotypical comments itself violates Title VII. Neither do they support creation of a "duty to sensitize." As the dissenting judge in the Court of Appeals observed, acceptance of such theories would turn Title VII "from a prohibition of discriminatory conduct into an engine for rooting out sexist thoughts." 263 U. S. App. D. C. 321, 340, 825 F. 2d 458, 477 (1987) (Williams, J., dissenting).

Employment discrimination claims require factfinders to make difficult and sensitive decisions. Sometimes this may mean that no finding of discrimination is justified even though a qualified employee is passed over by a less than admirable employer. In other cases, Title VII's protections properly extend to plaintiffs who are by no means model employees. As JUSTICE BRENNAN notes, *ante*, at 258, courts do not sit to determine whether litigants are nice. In this

---

be discounted as the product of stereotyping. If analysis like this is to prevail in federal courts, no employer can base any adverse action as to a woman on such attributes." 263 U. S. App. D. C. 321, 340, 825 F. 2d 458, 477 (1987) (Williams, J., dissenting). Today's opinions cannot be read as requiring factfinders to credit testimony based on this type of analysis. See also *ante*, at 277 (opinion of O'CONNOR, J.).

case, Hopkins plainly presented a strong case both of her own professional qualifications and of the presence of discrimination in Price Waterhouse's partnership process. Had the District Court found on this record that sex discrimination caused the adverse decision, I doubt it would have been reversible error. Cf. *Aikens, supra,* at 714, n. 2. That decision was for the finder of fact, however, and the District Court made plain that sex discrimination was not a but-for cause of the decision to place Hopkins' partnership candidacy on hold. Attempts to evade tough decisions by erecting novel theories of liability or multitiered systems of shifting burdens are misguided.

## IV

The language of Title VII and our well-considered precedents require this plaintiff to establish that the decision to place her candidacy on hold was made "because of" sex. Here the District Court found that the "comments of the individual partners and the expert evidence of Dr. Fiske do not prove an intentional discriminatory motive or purpose," 618 F. Supp., at 1118, and that "[b]ecause plaintiff has considerable problems dealing with staff and peers, the Court cannot say that she would have been elected to partnership if the Policy Board's decision had not been tainted by sexually based evaluations," *id.,* at 1120. Hopkins thus failed to meet the requisite standard of proof after a full trial. I would remand the case for entry of judgment in favor of Price Waterhouse.