23 F.3d 399
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Richard L. ARMSTRONG, Plaintiff-Appellant,
v.
LANCE, INCORPORATED, Defendant-Appellee.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Amicus Curiae.
 No. 93-1298.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 10, 1994.
Decided: May 9, 1994.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (CA-90-690-5-BO)
 Abraham Penn Jones, Raleigh, NC, for appellant.
 Robert John Gregory, Office of General Counsel, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae.
 Michael Vance Matthews, Blakeney & Alexander, Charlotte, NC, for Appellee.
 James R. Neely, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Office of General Counsel, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae.
 W.T. Cranfill, Jr., David L. Terry, Jay L. Grytdahl, Blakeney & Alexander, Charlotte, NC, for Appellee.
 E.D.N.C.
 AFFIRMED.
 Before WILKINSON and WILLIAMS, Circuit Judges, and RONEY, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 After being discharged, Richard L. Armstrong brought this action in federal court under Title VII of the 1964 Civil Rights Act, 42 U.S.C. Secs. 2000e-2000e-17 (1988), alleging race discrimination against Lance, Inc. The district court conducted a bench trial and concluded that Armstrong's termination was performance-related. Armstrong appeals that judgment and, finding no error in the district court's determinations, we affirm.
 
 I.
 
 2
 Armstrong, an African-American male, began working for Lance as a Sales Trainee in Lance's East Raleigh Branch in 1983. Lance produces a variety of snack foods which are sold in numerous stores and in vending machines. Armstrong's responsibilities included handling various sales routes for vacationing Sales Representatives, and coordinating special promotional events. In March 1985, Armstrong was promoted to Sales Representative and was transferred to the West Raleigh Branch where his supervisor was Branch Manager Leon Helms. Both Armstrong and Helms were under the supervision of Raleigh District Sales Manager, Bobby Kissam. There were approximately thirty Sales Representatives in the Raleigh area, of which three were African-American.
 
 
 3
 Armstrong's duties as a Sales Representative were to travel along an established sales route, visiting each customer approximately once per week to clean and restock sales displays and vending machines. Armstrong was also expected to maintain good customer relationships, acquire new sales accounts, and prepare sales-related paperwork such as invoices, inventories, account balances, and tax documents.
 
 
 4
 Shortly after his transfer to the West Raleigh Branch, Helms began to receive complaints from customers about poor service from Armstrong. The complaints included: (1) rudeness to customers; (2) failure to respond to their complaints; (3) failure to visit the vending machines regularly, resulting in stale or sold out merchandise; (4) improper ordering of merchandise; (5) failure to prepare proper sales documentation, tax records, and route log books; (6) failure to clean and maintain vending machines; (7) account shortages; (8) a tendency to forego or minimize route work on Fridays; and (9) a general hastiness and sloppiness in his work and driving habits. Helms officially counseled Armstrong on at least seven occasions between April 1986 and May 1989, but made no move to discharge him.
 
 
 5
 The impetus for Armstrong's termination was a series of complaints from Earl Franks of the North Carolina State University School of Veterinary Medicine. Franks had never criticized the work of the previous route salesman, but had become increasingly dissatisfied with Armstrong. He complained to Helms and Kissam that Armstrong would go for four to six weeks without servicing the account, which resulted in both stale products and prolonged shortages of products in the vending machine. Moreover, Armstrong did not return Franks's repeated phone calls to his answering service.
 
 
 6
 Upon receiving Franks's complaints, Helms and Kissam directed Armstrong to correct the situation immediately. Armstrong, however, continued to neglect the School of Veterinary Medicine account, insisting that it only needed servicing every other week, contrary to Franks's contention that it should be serviced every week, as required by Armstrong's job description. Frustrated with the service, Franks finally called Helms and Kissam and demanded that they remove the machine if it could not be maintained properly. Concerned about losing not only this account, but possibly the entire North Carolina State University account, Kissam directed Helms to fire Armstrong.
 
 
 7
 Armstrong's evidence at trial attempted to portray Helms and Kissam as supervisors whose work-related decisions were shaped by racial prejudice. Shortly after his discharge, Armstrong met with Helms informally to inquire about the possibility of being reinstated. Helms stated that Armstrong could not get his job back because he was "big and black" and intimidated people when he talked to them. (J.A. at 943.) Furthermore, James Hamm, another African-American route salesman, testified that in response to his inquiry about taking Armstrong's route, Helms said that "maybe a black shouldn't go behind a black at that particular time." (J.A. at 570.) Armstrong also introduced racially derogatory statements by Kissam. Armstrong testified that when he told Kissam that a fellow employee called him a nigger, Kissam stated, "if you don't get out of my face I'm going to call you a nigger." (J.A. at 689.) In addition, a former Branch Manager, Michael Cox, testified that he heard Kissam call Armstrong "that stupid nigger." (J.A. at 495.) Despite these reprehensible comments, the district court entered judgment for Lance, finding that Armstrong's termination was predicated solely on his deficient performance.
 
 
 8
 Armstrong appeals the district court's decision. He claims the court erred in determining that Lance's actions were not a prextext for race discrimination. In addition, Armstrong, and the Equal Employment Opportunity Commission (EEOC) as amicus curiae, contend that the court misapplied the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Finally, Armstrong claims that the court should have allowed him to amend his complaint to request a jury trial and punitive damages pursuant to the Civil Rights Act of 1991.
 
 II.
 
 9
 Armstrong first argues that the district court incorrectly concluded that Lance's actions were not a pretext for race discrimination. The court analyzed the evidence as outlined by the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which the Supreme Court recently restated in St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2747 (1993). Under the McDonnell Douglas test, to prove a discrimination case without direct evidence, the plaintiff must first establish a prima facie case by showing: (1) plaintiff is a member of a protected class; (2) he was qualified for the position; (3) he was discharged from the position; and (4) the position remained open and was filled by a person from outside of the protected class. Hicks, 113 S.Ct. at 2747. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the employer to articulate a reason, other than unlawful discrimination, for the adverse employment action. See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993). Once the employer satisfies that burden of production, the plaintiff must show by a preponderance of the evidence that the reason proffered by the employer was merely a pretext for discrimination. "The plaintiff, however, always bears the ultimate burden of proving that the employer intentionally discriminated against him." Id. Whether an employer has unlawfully discriminated is a factual finding which will not be disturbed on appeal absent clear error. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985).
 
 
 10
 In this case, the district court found after examining the entirety of the evidence that Armstrong's discharge was triggered by his dispute with Franks and his poor servicing of the School of Veterinary Medicine account. The court determined that Armstrong did not demonstrate that this reason was pretextual. Upon our review of the evidence, we conclude that the district court's finding is well supported and, thus, must be affirmed.
 
 III.
 
 11
 Armstrong and the EEOC as amicus curiae next argue that Armstrong should recover under the "mixed motive" analysis articulated in the Supreme Court's opinion in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Because we agree with the district court's finding that race was not a factor in Armstrong's termination, we reject this argument.
 
 
 12
 In Price Waterhouse, the Supreme Court held that, in order to rebut a showing that an unlawful discriminatory reason played a substantial part in an employment decision, the employer must show by a preponderance of the evidence that it would have made the same decision in the absence of the discriminatory motive. These are referred to as "mixed motive" cases. White v. Federal Express Corp., 939 F.2d 157, 160 (4th Cir.1991). However, to invoke a "mixed motive" analysis, the plaintiff must first show that an unlawful discriminatory reason played a part in the employment decision, which Armstrong failed to do. Although Armstrong produced evidence of racially derogatory language by Helms and Kissam, he failed to show any link between those statements and Kissam's decision to terminate him. To the contrary, the evidence demonstrates that Armstrong was counseled at least seven times for his poor performance, and was not fired until his deficient service threatened the loss of a major account.
 
 
 13
 In its opinion, the district court concluded that race played no factor in the decision to terminate Armstrong. The court stated: "[t]he evidence in this case establishes by a preponderance of the evidence that the decision of Kissam to fire plaintiff was based immediately and exclusively on the plaintiff's mishandling of the Veterinary School account and on no other reason." (J.A. at 454.) This determination is a factual one and will only be reversed if clearly erroneous. See Anderson, 470 U.S. at 573. From our review of the record, we conclude that the district court's findings are supported by substantial evidence, and we affirm the judgment of the district court.*
 
 IV.
 
 14
 Finally, Armstrong contends that the district court should have permitted him to amend his complaint, pursuant to Fed.R.Civ.P. 15(a), to request a jury trial and compensatory and punitive damages through retroactive application of the Civil Rights Act of 1991, 42 U.S.C.A. Secs. 2000e-2000e-17 (West Supp.1993). Armstrong filed this lawsuit on November 23, 1990, pursuant to the Civil Rights Act of 1964, as amended. On November 21, 1991, the Civil Rights Act of 1991 was enacted permitting jury trials and punitive as well as compensatory damages. On August 4, 1992, more than eight months after the law became effective, and three weeks before trial, Armstrong moved to amend his complaint. The district court denied Armstrong's motion citing, among other reasons, the late timing of the motion to amend and the substantial prejudice such amendment would cause to Lance, who had already completed preparation for a bench trial.
 
 
 15
 Although Rule 15(a) mandates that amendments to complaints should be granted freely "when justice so requires," whether to grant such motions is within the discretion of the trial court. Keller v. Prince George's County, 923 F.2d 30, 33 (4th Cir.1991). Moreover, a trial court may deny a motion to amend a complaint "where the motion has been unduly delayed and where allowing the amendment would unduly prejudice the non-movant." Deasy v. Hill, 833 F.2d 38, 40 (4th Cir.1987), cert. denied, 485 U.S. 977 (1988).
 
 
 16
 Lance, having prepared for a bench trial without regard to the issue of punitive damages, would have been prejudiced by amendment of the complaint at such a late date. Accordingly, we hold that the district court did not abuse its discretion in denying Armstrong's motion.
 
 V.
 
 17
 In summary, we hold that the district court correctly concluded that Armstrong's termination was based upon his poor performance, and not his race. We also hold that the district court was within its discretion in denying Armstrong's motion to amend his complaint.
 
 AFFIRMED
 
 
 *
 Armstrong also contends that the Civil Rights Act of 1991 altered the "mixed motive" analysis of Price Waterhouse by allowing a plaintiff to recover if race was a motivating factor in an employment practice, even though other legitimate factors motivated the practice. 42 U.S.C. Sec. 2000e-2(m) (West Supp.1993). The question of whether the Civil Rights Act of 1991 applies retroactively is currently pending before the Supreme Court. See Landgraf v. USI Film Prods., 968 F.2d 427 (5th Cir.1992), cert. granted, 113 S.Ct. 1250 (1993); Harvis v. Roadway Express Inc., 973 F.2d 490 (6th Cir.1992), cert. granted, 113 S.Ct. 1250 (1993). However, because we determine that Armstrong failed to show that race was a factor in the decision to terminate him, this is not a "mixed motive" case, and we do not need to consider this issue