

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-104-CV

RONNIE R. REBER AND ALAN R. TODD                    APPELLANTS

V.

BELL HELICOPTER TEXTRON, INC.                          APPELLEE

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I.  Introduction

In this labor law case, Appellants Ronnie R. Reber and Alan R. Todd assert in five issues that the trial court erred by granting a new trial to Appellee Bell Helicopter Textron, Inc. ("Bell") based on a misunderstanding of the application of the "mixed motive" theory in age discrimination cases (issues one, two, and three), whether a judgment can be final that does not dispose of

all parties and claims (issue four), and whether sufficient evidence was presented to support a mental anguish damage award (issue five).

## II.  Factual and Procedural Background

This case originated with thirteen plaintiffs' collectively suing Bell for age discrimination relating to a layoff that occurred in December 2001. With the plaintiffs' agreement, the trial court scheduled the case to be tried in four separate trials. Reber, Todd, and a third non-appealing party were in this trial.

### A.  Factual Background

According to Bell, as a result of adverse business conditions, Bell management determined that $100 million had to be cut from its 2002 budget. Among the issues Bell faced were serious problems with the V-22 project program, which was in danger of cancellation. Had the V-22 project been cancelled, it would have imperiled Bell's future as an ongoing company. Finally, as of the end of the third quarter of 2001, Bell was $100 million behind its sales plan for the year for its business and commercial aircraft.

In 2001, Jeffrey Pino was a senior vice president at Bell and headed its Commercial Business Unit. As such, he was responsible for profit and loss for Bell's commercial and international military business. His charge in a September 4, 2001 memo from Bell's chairman was to "close the gap in the profitability of the business unit [he] was assigned." To do that, Pino was directed to find

2

a way to save $40 million in his unit's operation. To accomplish that level of cost reduction, Pino made a significant reduction in personnel.

According to Bell, Pino and his team ranked all of the employees in his business unit and made decisions regarding whom to lay off based on a discussion of each person's strengths and weaknesses. Decisions were made based on the prospect of each employee's potential for contribution in a different work environment, and those who ranked at the bottom of the list, when compared with their peers, were laid off. Pino and his team decided to eliminate the marketing group and to have salesmen pick up that function. He also decided to eliminate the infrastructure operation because it was not making progress selling infrastructure services (consulting on heliports and landing locations for the V-22); Pino decided to devote one employee to that sales area on a part-time basis.

Pino was the decisionmaker regarding the layoffs in his unit, and according to Bell, neither he nor his team discussed or utilized age as a criterion for any layoff. Two employees who were let go by Bell were Reber and Todd.

**B. Reber**

Reber was employed by Bell from 1966 until his termination in December 2001. Reber worked in marketing and infrastructure development. He was told that his position was being terminated due to economic conditions. However,

3

he alleged that his job was taken over by a substantially younger and less qualified individual, Pat Foley. Bell confirmed at trial that Foley had replaced Reber.

According to Bell, the result of the rating exercise and the decisions regarding division functions was that Reber was ranked lower than the employees who were retained, most of whom, although younger than Reber, purportedly had specific skills that Reber did not have. Also, according to Pino, involved in Pino's decisionmaking process was knowledge that Reber had done a poor job developing what became a web-based program that facilitated customer communications with Bell.

Also according to Bell, Pino and his management team attempted to find other places in the organization for Reber, but in the end, the marketing department under Pino, which employed Reber, was largely eliminated.

## C. Todd

Todd, a sales engineer in the marketing group, had been employed by Bell from 1987 until his termination in December 2001. His function was to support salesmen and to provide technical evaluations of competing products for use when a salesman tried to make a sale to a customer. He was told that his job was being eliminated due to problems with the government, commercial problems, and reorganization. According to Bell, as with Reber, the result of

4

the rating exercise and the decisions regarding division functions was that Todd was also ranked lower than the employees who were retained; and most of these retained employees, also younger than Todd, purportedly had specific skills that Todd did not have. Todd had also been criticized for, among other things, falling asleep at meetings. According to Bell, Pino and his management team attempted to find other places in the organization for Todd but in the end, could not.

Shortly after being terminated, Todd discovered that a similar job was being advertised by Bell, and that the position was later filled by Britt McDermott, a younger, less qualified person whom Todd had trained.

### D. Procedural History

In the first trial, the jury found that age was a motivating factor in the decision to terminate Reber and Todd, and a final judgment was entered in their favor. Bell then filed a motion for new trial contending that the trial court's failure to submit a "mixed-motive" jury question warranted a new trial.[1] The trial court granted the motion for new trial, concluding that the jury had been improperly charged because of the omission of the mixed-motive question that

---

[1]In a "mixed-motive" case, the employee alleges that the employer had a mixture of legal and illegal reasons for the termination, that age was still a motivating factor for the discharge, but that the employee would have been terminated anyway, regardless of the age factor.

Bell had requested prior to the case's being submitted. Todd and Reber filed a motion for reconsideration arguing that this was not a "mixed-motive" case because the plaintiffs had never pleaded this theory. They also asserted that the decision whether to proceed on a mixed-motive theory in a discrimination case is a choice left to the plaintiff. The reconsideration motion was not granted.

The second trial was held in November 2006. A jury again found that age was a motivating factor regarding the termination of both Reber and Todd and awarded them $804,809. However, the jury answered affirmatively to the "mixed-motive" would-have-been-terminated-anyway question, thus leaving Reber and Todd without any damages.[2] This appeal followed.

### III. Age Discrimination Statutory and Case Law Background

#### A. Pretext or Mixed-Motive

While case law is abundant in both state and federal court, our supreme court lucidly articulated the parameters of these two types of age discrimination claims in *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473 (Tex. 2001).

---

[2]In a mixed-motive case, the employee is not awarded damages if the termination would have been made anyway for legitimate, nondiscriminatory reasons.

A brief discussion of these two approaches is warranted, as distilled from the *Toennies* case.

In a pretext case alleging age discrimination leading to termination, the plaintiff attempts to show that the reason given by the employer for having terminated an employee was a mere pretext for prohibited age discrimination, which is usually shown through circumstantial evidence. Likewise, in a mixed-motive case, the plaintiff attempts to show that age discrimination was a motiving factor in the termination, but through direct evidence, which shifts the burden to the employer to show that the termination would have occurred anyway, regardless of any age discrimination motive. *See id.* at 475-78. In a pretext case, the burden of proof on discrimination is with the complaining party. In a mixed-motive case, which involves direct evidence of discrimination, once the plaintiff proves the improper discrimination, the employer may avoid liability by "proving that it would have made the same decision even if it had not allowed [the improper motive] to place such a role." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45, 109 S. Ct. 1775, 1787-88 (1989). Subsequent to the *Price Waterhouse* decision, Congress enacted section 107 of the Civil Rights Act of 1991, which allowed a court in a mixed-motive case

> to award attorney's fees and other limited forms of relief so long as the plaintiff has proven that discrimination was a motivating factor in the employment decision, even if the employer's decision would

7

have been identical in the absence of discrimination. However, the plaintiff is not entitled to damages, back pay, or reinstatment if the employer proves that the same decision would have been made even without the discrimination. 42 U.S.C.A. § 2000e-5(g)(2)(B). The statute's plain language does not indicate that Congress intended section 107 to apply only in mixed-motive cases.

*Toennies*, 47 S.W.3d at 477-78.

Texas Labor Code section 21.125 is very similar to section 107 and reads in part as follows:

> (a) . . . [A]n unlawful employment practice is established when the complainant demonstates that . . . age . . . was a motivating factor for an employment practice, even if other factors also motivated the practice . . . .
> (b) In a complaint in which a complainant proves a violation under Subsection (a) and a respondant demonstrates that the respondant would have taken the same action in the absence of the impermissible motivating factor, the court may grant . . . attorney's fees and costs . . . but may not award damages . . . .

TEX. LAB. CODE ANN. § 21.125 (Vernon 2006).

The issue presented in the *Toennies* case was what standard of causation a plaintiff must meet in an age discrimination suit under the Texas Commission on Human Rights Act. *Toennies*, 47 S.W.3d at 474-75. The court noted that "because the federal courts are closely divided on the issue, we follow the plain meaning of the Texas Labor Code section 21.125." *Id.* at 474. Our supreme court held that a plain reading of section 21.125 established that the proper standard of causation was "a motivating factor" whether the case was a mixed-

8

motive case or a pretext case, rejecting the position of some federal courts that a "but for standard" was appropriate in pretext cases. *Id.* at 480.

## B.  The Parties' Respective Positions

Todd and Reber argue that *they* dictate whether the case proceeds at trial under a pretext or mixed-motive path, and only under the mixed-motive path is a defendant entitled to the section 21.125(b) "would have taken the same action" submission.  It is Bell's position that the United States Supreme Court eliminated the direct/circumstantial evidentiary proof distinction between pretext and mixed-motive cases in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92, 123 S. Ct. 2148, 2150 (2003), and that if the 21.125(b) defense is pleaded and evidence presented as to the issue, it is submitted to the jury.  In *Desert Palace*, the question presented was whether direct evidence was necessary to obtain a mixed-motive instruction in a discrimination case. *Id*. at 98-99, 123 S. Ct. at 2153-54.  The Court held that direct evidence was not necessary for several reasons, including the fact that "[o]n its face, the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Id.* at 98-99, 123 S. Ct. at 2153.  The Court also noted that the statute responded to the *Price Waterhouse* case "by setting forth standards applicable in mixed-motive cases in two new statutory

9

provisions." *Id*. at 94, 123 S. Ct. at 2151 (quoting *Landraf v. USI Film Prods.*, 511 U.S. 244, 250, 114 S. Ct. 1483, 1489 (1994)).

## C. Analysis

Like our Supreme Court in the *Toennies* case, we will review the plain meaning of section 21.125 of the Texas Labor Code analogously to the United States Supreme Court's review in *Desert Palace*. The statute does not mention pretext or mixed-motive theories or direct or circumstantial evidence. What it does say is that a complainant proves that if an unlawful employment practice was in whole or in part motivated by age, then liability is established unless an exception applies, which is not germane to this discussion.[3] TEX. LAB. CODE ANN. § 21.125(a). Further, although liability has been established, the employer can limit its damage exposure by showing that it would have taken the same action even without the motivating factor of age. *Id*. § 21.125(b).

The Fifth Circuit has analyzed the effect of *Desert Palace* on the pretext method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), and the mixed-motive method found in *Price Waterhouse*. The Court noted the following:

---

[3]"Unless . . . age . . . is combined with objective job-related factors to attain diversity in the employer's work force." TEX. LAB. CODE ANN. § 21.125(b).

Unlike *McDonnell Douglas*, which simply involves a shifting of the burden of production, *Price Waterhouse* involves a shift of the burden of persuasion to the defendant. In other words, under *Price Waterhouse*, once a plaintiff presents direct evidence of discrimination, the burden of proof shifts to the employer to show that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails . . . .

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004) (citing

*Mooney v. Aramco Serv. Co.*, 54 F.3d 1207, 1216-17 & n.11 (5th Cir. 1995)).

The court then cogently observed that following *Desert Palace*, "because the

direct evidence requirement has been removed from mixed-motive cases, it is

now harder to draw a distinction between *McDonnell Douglas* and mixed-motive

cases." *Rachid*, 376 F.3d at 310 (citing *Louis v. East Baton Rouge Parish Sch.*

*Bd.*, 303 F. Supp. 2d 799, 803-04 (M.D. La. 2003)). The court then held that

post-*Desert Palace* cases represent a merging of the *McDonnell Douglas* and the

*Price Waterhouse* approaches.

Under this integrated approach, called, for simplicity, the modified *McDonnell Douglas* approach: the plaintiff must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative).'" If a plaintiff demonstrates that age

11

was a motivating factor in the employment decision, it then falls to the defendant to prove "that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails."

*Rachid*, 376 F.3d at 312 (citations omitted).

We hold that the question of whether the section 21.125(b) "defense" is submitted is purely an evidentiary one akin to any other defense available to a defendant, because that is what the statute says. That is, the question is whether sufficient proof was proffered to support its submission to the trier of fact. It is the evidence adduced, not a party, that makes this decision.

**D. Application**

The question before us then is distilled to whether there was sufficient evidence adduced at the first trial to warrant the submission to the jury of the section 21.125(b) defense.

The following evidence is relevant to this issue:

- Bell management determined that $100 million had to be cut from its 2002 budget.

- Among the issues Bell faced were serious problems with the V-22 tilt-rotor program, which was in danger of cancellation.

- Had the V-22 project been cancelled, it would have imperiled Bell's future as an ongoing company.

12

- At the end of the third quarter of 2001, Bell was $100 million behind its sales plan for the year for its business and commercial aircraft.

- Pino's charge in a September 4, 2001 memo from Bell's chairman was to "close the gap in the profitability of the business unit [he] was assigned."

- Pino was directed to find a way to save $40 million in his unit's operation.

- To accomplish that level of cost reduction, after other expenses were examined and reduced, Pino was required to make a significant reduction in personnel in his department.

- Pino and his team ranked all of the employees in his business unit and made decisions regarding whom to lay off based on a thorough discussion of each person's strengths and weaknesses.

- Decisions were made based on the prospect of each employee's potential for contribution in a different work environment.

- Those ranked at the bottom of the list when compared with their peers were laid off.

- Pino and his team decided to eliminate the marketing group and to have salesmen pick up that function.

- Pino decided to eliminate the infrastructure operation because it was not making progress selling infrastructure services (consulting on heliports and landing locations for the V-22) and decided to devote one employee to that sales area on a part-time basis.

- The result of the rating exercise and the decisions regarding division functions was that Reber and Todd were ranked lower than the few employees who were retained, most of

13

whom, although younger than Reber and Todd, had specific skills that neither Reber nor Todd had. Pino was the decisionmaker regarding the layoffs in his organization and neither he nor his team discussed or utilized age as a criterion for any layoff, including the decision made regarding Reber and Todd.

- Because the V-22 program represented sixty to seventy percent of the company's labor base, the only way to manage costs after the V-22 program was reduced was to have a reduction in force.

- Also involved in Pino's decisionmaking process was knowledge that Reber had done a poor job developing what became a web-based program that facilitated customer communications with Bell.

- Todd was criticized for, among other things, falling asleep at a meeting.

- Pino and his management team vainly attempted to find other places in the organization for Reber, Todd, and others affected by the layoffs.

- In the end, the marketing department under Pino, which employed Reber and Todd, was largely eliminated.

The foregoing represents ample evidence warranting the section 21.125(b) submission to the trier of fact. Reber and Todd's first three issues are overruled.

## IV.  Conclusion

Having overruled Reber and Todd's first three issues, we need not address their remaining issues.  *See* TEX. R. APP. P. 47.1.  We affirm the trial court's judgment.


                                        BOB MCCOY
                                        JUSTICE

PANEL A:   CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: March 6, 2008